The opinion of the court, (Tilghman, C. J. being absent,) was delivered by,
Gibson, J.
The case stated in the bill of exceptions is this. The plaintiffs claim under an application of the 3d April, 1769, in the name of John Stevenson, for 300 acres, “ on the north side of Black Lick, about two miles from the fording;” which was surveyed on the 22d of April, 1773, by Joshua Elder, for John Pornroy, who on that day paid the surveying fees. Immediately preceding the date of this survey, one Reed, who was the brother-in-law of Pornroy, had a cabin on the land, and had girdled a few trees; and this imperfect improvement was purchased by Pornroy for 10 or 12 pounds. In 1775, Pomry put a tenant named Milligen on the land, who resided on it till 1777; during which interval he raised grain on it; but being driven off by the Indians, he enlisted, left the country, and never returned. From this time till 1789, the, possession it would seem remained vacant.
The defendants claim the part for which they obtained a verdict, under a warrant to a certain Stephen Porter, for 200 acres, “ on Stony Run, above Morehead’s mill, and adjoining his claim in Westmoreland county;” which bears date the 8th of December, 1774, and appears by the return to have been surveyed by Joshua Elder the 24th of November, 1775 On the 1st March, Í782, Porter conveyed, to Robert Johnson, who obtained a patent on the 14th of the same month, and who on the 13th of June, 1789, articled with William M‘Nitt, for the sale of it. On the 22d February, Johnson’s executors conveyed to MlNitt, under whom the defendants hold.
It is clear, that Elder did not survey Porter’s warrant by actually going on the ground, as he returned on it, the survey prepared for return on Pornroy’s location: the original paper being indorsed with Pomroy’s name, together with that of Porter, which is written over another name that has been erased, and the diagram answering to the courses and distances in the field notes of the survey made for Pornroy, and having a dotted line across its face to designate the part surveyed for Porto’. To this may be added, that in Elder’s book of field notes, there is no entry of a survey having been made for Porter. In pursuance of this plan, Pornroy's was removed and surveyed by Elder on Alteman’s run, (a stream which falls not into Black Lick but into Yough,) and returned as having been made the 26th May, 1793, for a certain Charles Bard, who pretended to-claim it by a conveyance from John Stevenson; but it is conceded that this Stevenson was not the person in whose name the location was taken out. Bard conveyed this newly surveyed tract to aco’*-"-" William M‘Farlane, who obtained a *216 tent for it on the 13th of May, 1788. After the close of the war of the revolution, Pomroy desired a witness to bear in mind that he (the witness,) had been present when his location was surveyed, because there would be a dispute about it, as other warrants had been laid on the land. He also spoke of getting a conveyance from Stevenson. He lived 16 or 17 miles from the land. After his death, and in the year 1789, MiNilt began to exercise acts of ownership on the land; on which the plaintiffs, who are admitted to be the heirs and representatives of Pomroy, went into actual possession. M(Nitt brought an ejectment against them to December term, 1809, and in 1811, suffered a nonsuit; but renewed the •action to December term in the same year, in the name of Johnson’s executors, and recovered: and the present action is brought to try the title a second time.
All the errors which have been assigned, resolve themselves into two — that the judge held that the plaintiffs claimed under a shifted location; and that they were barred by the laches of Pomroy, who, it was said, had not pursued his claim with due diligence.
The first point, if decided against the plaintiffs, would be decisive of the cause: for as the title on a shifted location does not, unless against a person having actual notice, attach before return of survey, and as Pomroy’s survey has never yet been returned; or if Porter should be taken to have had noiice of it, yet as there is a purchaser in the case for valuable consideration and without notice, who could not, under any circumstances, be affected by what was a personal equity against his vendor; the plaintiffs could not in either aspect recover. I do not recollect to have seen any definition of a shifted warrant or location, nor any description of the distinguishing circumstances between this kind of right, and any other. Where a warrant or location, which is descriptive of the land, with precise, or even reasonable certainty, is laid on land which does not answer the deseriptibn, there is no difficulty in determining that it has been shifted: but where the description is what is termed loose, but it is still evident from such imperfect description, that the warrant, or location, has been surveyed on other land than what was at. first intended — as where land on the north side of a creek'is called for, and the survey is of land on the south side— .the question is of more difficult solution, but one which it is unnecessary to decide here. The judge assumed the affirmative; and directed the jury, that as the location called for land “on the north side of Black Lick,” it was a necessary implication, that the creek was originally intended to be a boundary; and that as the survey was at some distance from this creek, although still on the north side of it, the land for which the location was intended, was not that on which it was surveyed. To.me, this construction appears artificial, and contrary to the popular meaning of the words which in cases of this kind ought to govern. In Lauman v. Thomas, 4 Binn. 5S, the Chief Justice says, “ great allowance *217 must be made for looseness of description in a country very little exploredi” I may add, that great allowance must also be made for the imperfect degree of skiff in language, which was possessed by those who were in the habit of drawing applications. In a new country where those permanent objects, which necessarily serve for purposes of reference, have not received established names, accuracy of description is impossible: the most that can be done is to designate the neighbourhood in which the grant is to be located^ and in doing so, the ascertaining with convenient certainty, of the body of the land intended to be purchased, and not the butting and bounding the survey on particular objects, is the primary intention of the description in the application. Besides, where an object would seem to be called for, as a boundary, the very spot in view might still be included by a departure from such object; so that what was essentially the subject of the intended grant, and constituted the motive of the purchase from the state, might still be secured by a survey which should not touch such boundary. I, therefore, am of opinion, that the plaintiffs location cannot be considered as having been shifted, merely because it does not bound . on the creek called for in the description.
The remaining question is, whether the plaintiffs are barred by the negligence of those under whom they elaim. Before the date of the defendants warrant, Pomroy had a survey on an indescripiive location; under which, the title commenced from the date of the survey, which was notice to all the world. What is the negligence imputed to him? It is said .to be the omission to have his survey returned, and to otherwise prosecute his claim with due diligence. As to not having' had the survey returned, although I admit it to be a general rule, that the owner of a survey on an in-descriptive location must have it returned within a reasonable time; still, as he had paid the surveying fees, he is not to be answerable for the misconduct of the officer, whose duty it was to make the return, and whose default in that particular, shall not prejudice the owner. Lessee of Drinker v. Holliday, 2 Yeates, 88. Lessee of Meade v. Haymaker, 3 Yeates, 67. In the case of a shifted location the rule is different, because as the title does not attach till the return of the survey, except against a party having actual notice of the survey, the land remains open to appropriation by others; and it is, therefore, the duty of the owner to have the survey returned and accepted, which is the completion of a new contract with the state, or to give actual notice at his peril; without which, no one can be affected by the survey. Actual notice raises an equity which is limited to the person receiving it; and a bonct fide purchaser for valuable consideration will, therefore, take the land discharged. But in the case before us, the owner having been no default, the survey is to be considered as if it had been ac-> tually returned; and considering it in that point of view,, the other circumstances of the case must be prodigiously strong to raise a 2e= *218 gal presumption of abandonment. Fisher v. Larick, 3 Serg. & Rawle, 319. In what then did Pomroy lack diligence? Both before and after Porter’s survey he had a tenant on the land, who resided on it till he was driven off by the Indians. The continuance of Indian hostilities would be a fair excuse, if excuse were necessary, for discontinuing the settlement till the peace. But before that time M(Nitt had purchased and paid his money : so that a resumption of the settlement, or acts of ownership subsequently-exercised, would have been of no value as notice to him of the existence of Pomroy’s claim. Tint Pomroy’s location not having been shifted, M‘Nitt was bound to*take notice of the survey at his peril. The strongest feature in the case is, that Pomroy haring done every thing he was bound to do, and being unaffected by the fraud of the deputy surveyor was in the attitude of an owner who had had his survey returned. As there is no evidence of his having been apprised of the fraudulent application of his survey to another right, it is fair to suppose he thought the surveyor had done his duty, and returned the survey on his location; and before he is to be prejudiced by not having complained of that officer to the board of property, it should appear that he knew he had cause for complaint. It was held in the Lessee of Davis v. Keefer, 4 Binn. 151, that the owner of a location, who has paid the surveyor’s fees and given orders to him to survey it according to the description, is not bound by a survey in another place, until he has been informed of it, and has acquiesced in it; and that his omission to look after the survey will not amount to an abandonment of his location. The first time Pomroy appears to have known of an adverse right was, when in Conversation with Charles Campbell, he desired him to bear in mind that he was present when Rider surveyed the land for him in 1773, for there would be a contest for it. At this time it was too late to enter a caveat against the return of survey on Porter’s warrant, for it had been accepted, and a patent had issued On it. There is nothing then to raise a legal inference of abandonment, and actual abandonment is out of the question; for the declaration of Pomroy in the conversation with Campbell, just now mentioned, and the alacrity of the plaintiffs in taking actual possession as soon as M‘Nitt began to exercise acts of ownership on the land, completely negative every inference of the fact. But this last was for the consideration of the jury, and is not the subject of error here. I can discover nothing like an abandonment as a -conclusion of law .from facts; and the judgment is, therefore, reversed on both grounds, and a venire facias de novo awarded.
Judgment reversed, and a venire facias de novo awarded.