2 WS 294
212        641

2ws   294
41SC   84

## Bolton *against* Hamilton.

The mere exclusive receipt of profits by one tenant in common for a period exceeding twenty-one years, is not sufficient evidence upon which to found a legal presumption of actual ouster of his co-tenant: but it raises a natural presumption of it, which will operate upon the minds of the jury so far as it happens to produce actual conviction of the fact.

ERROR to the Common Pleas of *Washington* county.

This was an action of ejectment brought in the Common Pleas of Washington county to August Term 1840, to recover 100 acres of land, situate in Carroll township, Washington county. The land had been originally entered in the name of William Hamilton, the father of the plaintiffs. Daniel Hamilton, the elder son, who acted as the agent of the father, took possession, and retained the legal estate in himself until after the death of his father, William Hamilton, who died intestate. David Hamilton, the second son, administered.

Daniel Hamilton, retaining to himself his purpart of the real estate of William Hamilton, deceased, conveyed by his article to David Hamilton, dated 1st February 1787, " in behalf of himself, (*David*) and in trust for the other heirs of William Hamilton," the land in dispute. From that time until his conveyance to David Hamilton, the defendant, by his deed, bearing date 15th of April 1839, he remained in possession, and took the profits.

William Hamilton left seven children, two of whom are the plaintiffs in this action.

David Hamilton, in 1787, made application to the Orphans' Court of Washington county for partition or valuation of the real estate of his father, William Hamilton; it was appraised, and David agreed to take the same at the valuation, but entered into no recognizance for the payment of distributive shares.

In 1794, of March Term, David Hamilton brought his action of covenant on the article of agreement already alluded to, bearing date the 1st day of February 1787. The declaration in covenant set forth the article in full, showing that Daniel conveyed in trust for the heirs of William Hamilton. By agreement, when the jury was empannelled and sworn, a juror was withdrawn, and David Hamilton, by consent, took judgment for costs.

On the 15th of April 1839, David Hamilton conveyed by *special covenants*, &c., the land the subject of this ejectment, to Joseph Hamilton, the defendant. In his deed he recites as follows: " It being part of the same tract of land which was formerly owned

[Bolton v. Hamilton.]

by William Hamilton, deceased, and which was appraised by order of the Orphans' Court of said county, and report made thereon to our said court on the first day of May 1787, whereupon Daniel Hamilton, heir at law, resigned his right of *redemption* to the said premises, and David Hamilton, the grantor aforesaid, second son of the said William, accepted the same at the *appraisement*, as will more fully appear on reference to the record being had; and the said David Hamilton, Esq., had a suit against the said Daniel Hamilton to No. 29, March Term 1794, upon summons covenant, &c., and brought to trial, whereupon the said Daniel confessed judgment for costs, under which judgment the said David Hamilton, Esq., holds his title to the said tract of land."

On the trial the evidence of Sept. T. Hamilton, of Harrison county, Kentucky, was offered and read as taken in pursuance of a commission issued out of the Common Pleas of Washington county, the material parts of which are in answer to interrogatory third.

" I had a conversation with David Hamilton, about the 10th of August 1833, between David Bolton's and David Hamilton's, while helping them to load rock, and David Hamilton stated that he lived on the land, and intended to do so as long as he lived, but said the title was not in him, but in his father, William Hamilton; but as he had defended it in a long lawsuit, he considered himself entitled to it as long as he lived, and said it was but little difference to him who got it after he was dead, as he had no family; and then stated that Daniel Hamilton had received his share allotted to him before he left Pennsylvania, and that he had settled with M'Donough for his part some years before; he also stated one other legatee had no interest, as he had assigned his right to him. Whether it was Hugh Wily or Robert Barr I cannot now say, but it was one or the other of them; he also stated that his mother lived with him several years, and that after she left him he had to pay her twenty dollars a year as long as she lived; he also stated that John Hamilton, David Bolton, and one other of the heirs, had an interest in the land, naming the other, but I do not now recollect who that other was; it was either Hugh Wily or Robert Barr; he also stated that John Hamilton left Pennyslvania when very young, and had never called for anything."

The plaintiff requested the court to charge the jury upon these points:

1. That as David Hamilton came into possession of the land in dispute, under an express trust from Daniel Hamilton, all the proceedings of the Orphans' Court of Washington county, as offered in evidence by the defendant, are absolutely void, the said court having no jurisdiction of the subject matter.

2. That if, in the opinion of this court, the Orphans' Court as aforesaid, had jurisdiction, the court is then requested to charge

[Bolton v. Hamilton.]

—That David Hamilton acquired no interest in the land, the subject of this ejectment, by virtue of those proceedings, inasmuch as those proceedings were not consummated by the said David entering into recognizances for the payment of the distributive shares to the heirs of William Hamilton, deceased, and that he had abandoned all claim, by virtue of those proceedings, is to be further inferred, from the fact, that in the *recital* of his deed to Joseph Hamilton, the defendant in the present ejectment, he expressly disclaims holding title other than that which he derives by virtue of the judgment No. 29, March Term 1794, of the Common Pleas of Washington county.

3. That the judgment above referred to confers no title, but it being recited in the deed of David Hamilton to Joseph Hamilton, the defendant, it operates as a re-affirmance of the trust estate, and the right of the heirs of William Hamilton, deceased, to the land in dispute, as late as the year 1839; and that Joseph Hamilton, the grantee of David Hamilton, is bound by the trust, and is fully notified of its recognition, by the recital in the deed under which he claims.

4. That inasmuch as David Hamilton came into possession of the premises in dispute, by virtue of an express trust, in behalf of the heirs of William Hamilton, deceased, he could not in equity do any act in derogation of the interests of his *cestui que trust*.

5. That in all cases of express trusts, no lapse of time is a bar to recovery.

6. That the deed conveying to David Hamilton the land in dispute, by Daniel Hamilton, is an express trust direct, and of the kind exclusively belonging to chancery.

7. That Joseph Hamilton, the defendant in this ejectment, is affected by the trust, inasmuch as the deed under which he claims from David Hamilton, recites the trust conveyance from Daniel to David.

8. That to enable time to be a bar to the plaintiff's recovery, defendants must show a peaceable adverse possession for twenty-one years; and that inasmuch as the grantor came into possession as a trustee, under an express trust, it would require some decisive act to make the possession adverse, and of this adverse holding the *cestui que trust* must have notice, of which fact the jury are to judge.

9. That the conveyance to the defendant by David Hamilton is the only decisive act of an adverse holding, and that the statute would only begin to run from the time of that conveyance.

Charge of the court :

I shall not trouble and confuse the jury by a detailed answer to each of the plaintiff's points. The case does not demand it, and if the plaintiff thinks that it will be of any benefit to his case, the jury may assume that David Hamilton derived no title to the land in dispute from the proceedings in the Orphans' Court, or

[Bolton v. Hamilton.]

under the judgment No. 29, of March Term 1794. To simplify the case, we instruct you to allow him all this. The defendant then stands upon a peaceable and exclusive possession for upwards of fifty years, or at least upwards of forty years.

The land belonged originally, no doubt, to William Hamilton, the father of the plaintiff, and of David Hamilton, and may have been taken up in the name of Daniel, his eldest son. This may explain both the proceedings in the Orphans' Court and the conveyance from Daniel to David. But, suppose these things not to exist, William Hamilton died at all events before February 1787, fifty-four years ago. David took possession of what we suppose and take for granted belonged to all the children of William Hamilton. William left three sons, Daniel, David, and John, (one of the plaintiffs,) and five daughters, Mrs Wylie, Mrs M'Donough, Mrs Scott, Mrs Bolton, (the plaintiff,) and Mrs Barr. David lived on the land from 1787 to his death, which was two or three years ago, and the defendant, who claims under him, since his death, until the present time. The sisters of David Hamilton lived with him until they respectively married. Mrs Barr was the last to marry, and she was married and left forty years ago; since then no one of the children of William Hamilton has lived on the land.

Therefore there was no other trust than such as exists between tenants in common; and whatever may be the case of express trusts, this is not a trust unaffected by the lapse of time. It has been decided in England that after thirty-six years, the jury may presume an ouster of one tenant in common by his co-tenant, and I am inclined to think that when one tenant in common has had the exclusive and peaceable enjoyment of the land for twenty-one years, the jury may, and probably ought, in Pennsylvania, to presume an ouster. At all events, we instruct you, in this case, that after the lapse of forty or fifty years, you not only may, but ought to presume an *ouster*, and the defendant's title has become indisputable by the Statute of Limitations, or by the lapse of time independent of any statute.

The recital in the deed of David Hamilton to the defendant does not amount to a recognition of a subsisting trust, nor is the defendant affected by any trust which may, fifty years ago, have existed between David Hamilton and his co-tenants. It requires nothing more than the peaceable and exclusive perception of the profits by one tenant in common for the length of time which exists in this case, or, as I said before, probably for twenty-one years, to be sufficient evidence of an ouster of his co-tenants. Of this exclusive perception they of course had notice, and from the commencement of that exclusive perception, and not from the deed of David to defendant, the statute would begin to run. At the time of the alleged declarations of David, as proved by Septimus Hamilton, David's title had become impregnable, and any admissions as to its origin would not restore the title of his co-tenants.

II.—38

[Bolton v. Hamilton.]

What we have said, answers, we think, all the points of the plaintiff, so far as they bear upon the case. This is all that is incumbent for us to do, and all that is necessary to enable you to dispose of the case.

The plaintiffs excepted to the charge.

The errors assigned embraced all the points answered by the court.

*Alden* and *Dunlop*, for plaintiff in error, contended, that an exclusive perception of profits by one tenant in common, without any other attendant circumstance, for twenty-one years, or any greater length of time, would not bar the recovery of his co-tenant; and cited 10 *Watts* 185; 16 *Serg. & Rawle* 36. The acknowledgments of David, as testified to by Septimus Hamilton, were sufficient to prevent the effect of lapse of time. 10 *Watts* 261. The recital in the deed from David to Joseph Hamilton, amounts to a recognition of the subsisting trust. 2 *Caines' Cas.* 326; 10 *Johns.* 374; 4 *Binn.* 231; 1 *Dall.* 67; 2 *Serg. & Rawle* 350; *Amb.* 311; 2 *Mason* 531; 1 *Gallis.* 41; 7 *Cranch* 506; 1 *Chit. Chan. Dig.* 29; 1 *Sim. & Stew.* 347.

Possession, to give title, must be adversary. 9 *Wheat.* 241, 288. The entry of one tenant in common, is the entry of all; so the entry of trustee, is for the benefit of *cestui que trust;* and either as trustee under an express trust, or as tenant in common, there must be some decisive act, showing an intention to disseise, before an ouster can be presumed. The mere perception of profits is not sufficient, as decided in the case of *Hart* v. *Gregg,* (10 *Watts* 185), nor claiming title, because claim does not alter possession. But there must be some decisive act, tantamount of itself to a disseisin. The conveyance of David to Joseph is the only act which appears on the record that of itself amounts to a disseisin. The statute could only begin to run from the execution of that conveyance.

*M'Kennan,* for defendant in error. It is indisputably true, that the defendant, and those under whom he claims, have been in the exclusive possession of the land in dispute for fifty-four years, claiming title under a decree of the Orphans' Court. The question, therefore, does not arise, whether a receipt of profits alone by one tenant in common for any length of time, would amount to an ouster in law. The recital in the deed is unintelligible, as is plainly seen, and can have no influence upon the cause. 9 *Watts* 379; 4 *Serg. & Rawle* 570; 16 *Serg. & Rawle* 384; 5 *Watts* 149; 2 *Rawle* 305; 10 *Serg. & Rawle* 187; 10 *Watts* 158. The loose declarations of David Hamilton as to his possession, cannot affect his title. The law requires greater solemnity than parol evidence of conversations, to deprive a man of his land. 4 *Whart.* 289.

[Bolton v. Hamilton.]

The opinion of the Court was delivered by

GIBSON, C. J.—It is, perhaps, not to be maintained that a jury is bound to raise a legal presumption of ouster from an exclusive actual possession by a tenant in common for twenty-one years, though it is indicated as the opinion of the court in *Mehaffy* v. *Dobbs*, (9 *Watts* 363). The matter was perhaps not very clearly stated by the judge in that case; but the design was, to put the decision of the point on the basis of *Frederick* v. *Gray*, (10 *Serg. & Rawle* 182), in which it was held that the possession of a tenant in common is to be deemed adverse from the time he exclusively claimed the whole; and so the law was laid down in *Phillips* v. *Gregg*, (10 *Watts* 158), with this qualification, that his claim appear to have been indicated by some unequivocal act, which is perhaps the true criterion. In *Frederick* v. *Gray*, it was held sufficient that a claim of exclusive ownership was manifested by the occupant's *acts;* yet such acts ought so necessarily and notoriously to import a claim of exclusive right, as to apprize the co-tenant of the nature and existence of it. Thus, in *Law* v. *Patterson*, (1 *Watts & Serg.* 186), the land was purchased and paid for by the co-tenant in possession; and he had not only taken all the profits of it to himself, but had let it, and exercised all the usual acts of exclusive dominion over it, under the immediate eye of his co-tenant, who lived in the neighbourhood, and whose claim to ownership in common rested only upon the fact that his name was found as a grantee in the deed. And perhaps the decision of the court in *Hart* v. *Gregg*, (10 *Watts* 190), went no further, though it contains a *dictum* that a claim of exclusive right, attended by a receipt of all the profits, is insufficient to let in a presumption of ouster—a position not easily maintainable against the preceding decisions, or that in *Doe* v. *Prosser*, (*Cowp.* 217). It seems to be admitted by the opinion of the court, in *Hart* v. *Gregg*, that claiming the whole, and *denying* possession to the co-tenant, as the law was held in *Doe* v. *Bird*, (11 *East* 219), would have that effect; but it is hard to perceive a substantive difference between such a denial and a claim of exclusive right. The one is perhaps implied by the other, and the difficulty has regard to the notoriety of the act by which the assertion of right is to be proclaimed. Still, the judge below went too far in directing that a receipt of profits merely, may be sufficient to found a legal presumption of actual ouster. Such a receipt, for a great length of time, may indeed raise, not a legal, but a natural presumption of it, passing with the jury for what it is worth, and operating no further than it happens to produce actual conviction of the fact, as it was allowed to do in *Nickle* v. *M'Farlane*, (3 *Watts* 167), where it was ruled that the jury were not *bound* to presume an ouster from an exclusive possession of sixty years, even though the parties had not stood in the relation of tenants in common. When the cause goes to another trial, therefore, it will be for the jury to say whe-

[Bolton v. Hamilton.]

ther they ought to believe, from lapse of time merely, that the plaintiffs or their ancestor had parted with, or lost their title. The judgment is therefore reversed, and a *venire de novo* awarded.

HUSTON, J. *dissenting.*—In most of the cases in which there has been a difference of opinion in this court, that difference has arisen from the different view of the facts taken by different Judges. I shall in this case state the facts which appear on this record, in the order of time in which they occurred. It was agreed, as well as proved, that the land in question was the property of William Hamilton, though he had taken a warrant in the name of Daniel, his oldest son; that William lived and died, some time before 1787, in possession; he died intestate, leaving three sons and five daughters, viz: Daniel, David, and John (one of the plaintiffs), Mrs Wylie, Mrs M'Donough, Mrs Scott, Mrs Bolton (one of the plaintiffs), and Mrs Barr. At the time of his death, the oldest son had two shares. It would seem there was also a Virginia entry, and that somehow Daniel had a right to this. Daniel and David, by an article of agreement, which is found recited in a declaration filed in a suit by David against Daniel in 1794, agreed as follows:—

"Whereas, by certain articles of agreement, made at Washington, in the county aforesaid, on the first day of February, in the year of our Lord one thousand seven hundred and eighty-seven, between the said Daniel of the one part, and the said David of the other part, the said David and the said Daniel did covenant and agree with each other in manner and form following, to wit:— The said Daniel and Mary his wife, on their part having included a certain 183½ acres of land, *the property of the heirs of William Hamilton, deceased,* situated on the north-eastern side of the road leading from Devor's Ferry to Washington town, and a line run by Benjamin White in our actual survey, together with 114 of our own, lying on the south-eastern side of said road and line, the same being surveyed on a Virginia entry obtained from and in the name of Henry Sawings, do hereby oblige ourselves to take a Patent from the Land Office of Pennsylvania for the same—and make seals, and deliver unto the said David Hamilton, *in behalf of himself and the other heirs,* and do hereby quit all claim to any part or parcel thereof (of the said William Hamilton), a lawful deed of conveyance of the said 183½ acres, with its proper description and appurtenances, as soon as may be convenient for a clerk to draw the writing after the said patent is obtained; and the said David, on his part, doth hereby obligate himself to clear the said Daniel of all accounts from or belonging to the estate, to pay or cause to be paid unto the said Daniel his *true proportion,* to be paid as soon as said Daniel pays his, according to the number of acres in the draft, and all fees, purchase money, and expenses, which have or may accrue till patent is obtained and conveyance made."

[Bolton v. Hamilton.]

We next find, on the 1st of May 1787, what is called a record of the Orphans' Court, as follows:—At an Orphans' Court held at Washington, in the county of Washington, on the first day of May, A. D. 1787, before Daniel Leet, John Worth, and Thomas Scott, Esquires, Justices of the same court, &c. The court do appoint Hugh Scott, Patrick M'Cullough, and James Innis, to appraise the land, late the estate of William Hamilton, deceased, to such of the family as may appear to be entitled to it. The said appraisers report that the premises above-mentioned is worth £206 Pennsylvania—and Daniel Hamilton, heir at law, resigned his right of redemption to the said premises, and David Hamilton, the second son, accepts the same at the appraisement. And now, to wit: second of May 1787, before John Hoge, John Worth, and Thomas Scott, Esqs., and Justices of the Orphans' Court, on account in favour of the said David for sundry improvements made on the said premises, and other expenses, amounting to £38 3s. 8d., allowed him out of the £206 by the court and certificate, &c., pr.

We have next the full record of an action of covenant, to March 1794, David Hamilton v. Daniel Hamilton; breach in narr. is not making a deed. We see by the recital in the deed from David to Joseph, that Daniel made a deed 29th of September 1796, and the record shows a judgment for costs early in October 1796, in the action of covenant. Neither the original articles above dated 1st of February 1787, nor this deed of 1796, were produced; we don't know if searched for; we have only the recitals of them as above stated.

The judge states—I suppose, from testimony not on our paper book, that David lived on the land from 1787 until his sale in 1839, and the defendant, who purchased from him, ever since; that the sisters of David Hamilton lived with him until they respectively married; Mrs Barr was the last, and she left forty years ago, and since then no child of William Hamilton's, except David, has occupied or lived on the land.

This ejectment was brought to September Term 1840, and tried at February Term 1841—a commission issued to Kentucky to take depositions, and the testimony of Septimus Hamilton was taken, of which the only part alleged to be material and put on our paper book, is as follows:—

"I had a conversation between David Bolton's house and David Hamilton's, about the 10th of August 1833, while helping them to load rock. David Hamilton stated that he had lived on the land, and intended to do so as long as he lived, but said the title was not in him but his father, William Hamilton; but as he had defended it in a long lawsuit, he considered himself entitled to it as long as he lived, and said it was but little difference to him who got it after he was dead, as he had no family; and then stated that Daniel Hamilton had received his share allotted to him before he

left Pennsylvania. That he had settled with M'Donough for his part some years before; he also stated one other *legatee* had no interest, as he had assigned his right to him. Whether it was Hugh Wylie or Robert Barr, I can't now say, but it was one or the other of them; he also stated that his mother lived with him several years, and that after she left him, he had to pay her $20 a year as long as she lived; he also stated that John Hamilton, David Bolton, and one other of the heirs, had an interest in the land, naming the other, but I can't recollect who the other was—it was either Hugh Wylie or Robert Barr. He also stated that John Hamilton left Pennsylvania when very young, and had never called for anything."

There is no one thing which would produce more extensive injustice than deciding cases which originated before 1790, when a legal character first came on the bench of the Common Pleas, by the forms and practice since introduced—I mean deciding them on what now appears in the office of the clerk of the court, or on any record. Before that time, the justices of the peace were the presiding judges, and another justice, prothonotary or clerk of the Orphans' Court—all equally ignorant of forms, and equally ignorant of the necessity of every thing appearing on the record. As I was admitted to the bar in 1794, I can't speak of the practice before that time from my own knowledge, except so far as I have examined the records of transactions in previous times. I was concerned in *Selin* v. *Snyder*, and can say, that in Northumberland county, until after 1787, nothing remained to show what was done in the Orphans' Court, but detached papers or short entries on the minutes of the clerk of the court—there was nothing like a regular Orphans' Court docket, and no one proceeding in which could be found evidence of what is now required in some counties. I say some counties, for in many I know the records of that court are lamentably defective up to this time.

In *Walton* v. *Willis*, (1 *Dall.* 351), which first came before the court in 1778, M'Kean, Chief Justice, first suggested the propriety of a child, who took an estate at the appraised value, entering into recognizance to pay to the other heirs their proportions of the valuation. It would then be absurd to object to the want of recognizances in this case : such a thing had then never been thought of. If bonds were given in any case, for any debt, 54 years ago, and then paid, the man who would expect these bonds to be in existence, so that they could be produced now, cancelled, knows little of the usage among farmers and mechanics in former times, or even at this time. In nine cases out of ten, a bond or note, as soon as it is paid and lifted, is burned; and in all cases, after 20, or 30, or 40 years, is destroyed as totally useless.

The Act of 1764 (3 *Smith's Laws* 159) says, when lands cannot be divided, the Orphans' Court shall order the whole to the eldest son, or if he will not accept, to the others successively,

[Bolton v. Hamilton.]

he or they paying to the other children their proportional parts of the valuation; or giving security for the purpart thereof in some reasonable time, as the Orphans' Court shall direct; and the person or persons to whom payment or satisfaction shall be so made for their respective parts, shall be for ever barred of all right, title, or demand, to or out of the intestate's lands and tenements aforesaid. The judge threw out of view the proceedings in the Orphans' Court. I think them material and conclusive: and it has been more than once said by this court, if they see a plaintiff cannot recover, they will not send a case to be tried again.

The objections which were made to what appears to have been done in the Orphans' Court, were all taken in *Walton* v. *Willis*, (1 *Dall.* 351). In that case, it was argued that Willis never paid the heirs or gave bond; but the case was heard in the Supreme Court in five years from the intestate's death, and during that time had been in contest. There had been no sale to a third person—no lapse of 57 years from decree of Orphans' Court.

If bonds had been given by David, they would be presumed to have been paid, though they were produced by the heirs. If recognizances, and still open, they would have been presumed to have been satisfied. The heirs in those days took bonds or notes. The court never saw or heard of them, or adjudged them sufficient. I venture to say nothing of the kind will be found in that county before 1788. If the heirs, or their guardians, were satisfied, it was all that was done. The decree of the Orphans' Court vested the estate in David; and at this length of time it would be, and must be taken that the other heirs were paid or satisfied.

Let us examine this case: The valuation was £206; from which was to be deducted £38, leaving £168. Daniel had then two shares, which made nine parts—each £18 15*s.*; but if the widow's third was deducted, the share due each was £12 10*s.* The sisters all lived with David until married. The clothing for a few years—a horse, or a bed and bedding—a cow, a few sheep, a little furniture—any or a part of these would pay off a sister. Who ever heard of five men, to whose wives money was due, waiting all of them more than 40 years and never asking for it?

I know there was a time when proceedings in the Orphans' Court were examined into in ejectments; but that time seemed before this case to have passed over. *Messinger* v. *Kintner*, (4 *Binn.* 97), is the last case in which they were reversed in that way; and every time that case has been mentioned since, an apology for it has been attempted. Ever since the Act of 1713, the Orphans' Court has been a court of record, and one having exclusive jurisdiction in cases like this; and if any point is settled, it is, that what is done by a court of competent jurisdiction within its powers, is conclusive on every other court, except on appeal or writ of error (see 11 *Serg. & Rawle* 429, and the following pages of that case). For a statement of the practice of

[Bolton v. Hamilton.]

Orphans' Courts, and the consequence of deciding that everything must now be found as it ought to have been, see 11 *Serg. & Rawle* 431, and 7 *Serg. & Rawle* 166. A sale, of which no return could be found, was held good, (1 *Yeates* 118), when M'Kean, and Shippen, and Yeates, were on the bench; the youngest of whom had then had more than 30 years' experience, and all of whom were most profound lawyers.

The case referred to in 11 *Serg. & Rawle* was a sale by order of the Orphans' Court; but the principles apply to a taking at the appraisement, and several of the cases there cited were of this kind. I contend, then, that after this lapse of time we must take it that the money was at once paid to the other heirs, or securities given, which have been since taken up and long ago destroyed as useless papers.

A great part of the argument in the Common Pleas and here, related to some imaginary trust, and the supposed law relating to it. It would be useless to inquire how the practice arose of a man who applied for a warrant and paid for it, yet took the warrant in the name of some third person. We find *dicta* as to the nature of the right of such warrantee. In Addison's Reports we find him saying that if such warrantee conveyed to a third person who had no notice as to who paid the money, such third person would hold against the real owner. This was only a *dictum*, but I suppose it gave rise to this suit. I shall not stop to inquire whether in any possible case this *dictum* is law; nor shall I in this case enter at large into the nature of such warrantee's title. Chief Justice M'Kean has said that such warrantee has not a *scintilla* of interest—not even enough to save an escheat, if the real owner died without heirs. It is safest to confine an opinion to the case before us. William Hamilton, the father, took out the warrant, had it surveyed, entered on the land, and lived and died in possession, and left his family in possession. The statute and the law and common sense then vested the whole interest in his heirs. Daniel admitted this, in his declaration in the articles of 1st of February 1787; nothing more was necessary to vest the formal as well as real title in his father's heirs. The opinion of Judge Addison, and the fact that at the land office at that time they would not grant a patent without a deed-poll from some person of same name as the warrantee, occasioned the heirs of William Hamilton to stipulate for a deed from Daniel. The fact of Daniel stipulating that he should receive his share of the valuation money, shows that all parties understood the sense and justice of the matter, though they were perplexed by some supposed point of law. Now, whether Daniel's articles were considered sufficient, or whether he had executed a deed before the valuation, or whether that deed was made to all the heirs by name, or to David in trust for them, made no difference. The effect was that the formal title and beneficiary interest were united, and the rights of the family

[Bolton v. Hamilton.]

in law and equity became precisely as they would have stood if the warrant had been in their father's name. The appraisement and decree of the Orphans' Court vested all the interest of all the heirs in David. But Daniel did not make his deed until after the land had been allotted to David, and it was made to him (as recited) in behalf of all the heirs of William Hamilton. At that time the interest of all the heirs was in David. The effect of this deed, then, was to vest the formal title in David for his own use. That these declarations of trust shall be construed according to the intent of the parties, and to effect the right and justice of the case, has been settled ever since *Plowden* v. *Cartwright*, (1 *Burr.* 282), and is found in every book. In *Diermond* v. *Robinson*, (2 *Yeates* 324), it was decided that a purchaser from one of the heirs stood precisely in the situation of that heir, and had all his rights and was subject to all that he was subject to. If the other children had conveyed to David while the formal title was in Daniel, and afterwards Daniel had conveyed to them, or to some person in trust for them, this title would have enured to the use of David; and the heirs could never have availed themselves of such conveyance against David.

But another point was made below, assigned for error, and insisted on here. The deed from David Hamilton recites that the land was owned by his father, William Hamilton, was appraised, and being refused by his elder brother, was awarded to him—(this is proved in the cause). It then recites that Daniel, in whose name the warrant was taken, conveyed to David on the 29th of September 1796. It then goes on to refer to the action of covenant before referred to for not conveying, and that in it Daniel Hamilton confessed judgment for costs, *under which judgment the said David Hamilton holds his title to the said tract of land.* Now this recital, as respects this cause and the rights of the parties, is simply nonsense. The wonder is, that counsel should suppose and insist that that title, perfectly good as recited, should be totally destroyed, because the scrivener, after drawing a perfect deed, by mistake or inadvertence, inserted a sentence entirely without meaning. No court ever decided so, and I hope none ever will.

I have assumed, and endeavoured to prove, that the act of the court in allotting this land to David is, at this time and between these parties, conclusive. An Orphans' Court is as much a court of record as the Common Pleas. In some thousand cases before, and many since 1790, judgments have been signed without a narr. filed. These would have been set aside on error brought, or on motion; but executions have issued and lands sold, and the uniform decision has been that this cannot be taken advantage of in ejectment by the defendant in the judgment against the purchaser. See *Heister* v. *Fortner*, (2 *Binn.* 40); and a late case *Brown* v. *Johnson*, (4 *Rawle* 146).

But all this is to be set aside by the parol evidence of a certain

II.—39                2 A *

[Bolton v. Hamilton.]

Septimus Hamilton, pretending to relate what he calls a conversation with David Hamilton in 1833, just fifty years after the land was decreed to David, about thirty-nine after his brother made the formal title, and more than thirty after the youngest sister had married. The first thing which strikes us is, that David was an idiot, or was answering the questions of an impertinent fellow, so as not to give him any information. 1st. David tells him he has no title — which was not true: next, that Daniel had got the share allotted to him: next, that he had paid M'Donough and one other *legatee*. Now this showed that he owned four shares of what the witness says David told him he had no right to: next, it shows that sums had been allotted to the other children; and then he tells, David said that John Hamilton and Bolton owned part of the land. The jury will judge whether all this is credible, or will consider it the fabrication of a man who had not sense or honesty enough to tell a probable story.

But suppose it true. It has been decided that declarations to strangers, made before the statute has run, may be given in evidence to bar its effect. Whether such loose talk after the statute has run can be received to destroy a perfect title has not perhaps been directly decided in this court; but it has often occurred in other states. 6 *Johns.* 21. Disclaimer by parol of title not admissible. 7 *Johns.* 188. A disclaimer not made to or in presence of the other party is inadmissible. And in another case, Spencer, Justice, says, where a person has shown a good title to permit this to be destroyed by parol proof would be breaking on the Statute of Frauds in the most essential manner.

We will not permit it against a deed: can we against a record and a deed? But an ejectment will not lie, at all events against a purchaser, after fifty-seven years' acquiescence in a decree of the Orphans' Court. There was a time when an ejectment was brought to recover a legacy charged on land. That is over since *Brown* v. *Furer* and *Gause* v. *Wiley*, (4 *Serg. & Rawle*).

I am not aware that an ejectment was ever brought to recover a portion from the heir to whom land was allotted by the Orphans' Court after appraisement. It has been brought in *Messinger* v. *Kintner* and *Fogelsonger* v. *Somerville*, to set aside the whole proceedings as void or fraudulent; but I would suppose that now the only remedy is by appeal. At all events it cannot lie after an acquiescence so long as in this case, and against an innocent purchaser.

I am further of opinion the statute was a bar if even the plaintiffs once had right. Lord Mansfield says an ouster ought to be presumed after thirty-six years' quiet possession by one tenant in common. In *Vandick* v. *Vanbrunn*, (1 *Caines* 83), it was held, that after fifty years the possession of one tenant in common of the whole must be considered adverse, and that a deed by the other is void, as being by a person out of possession; and that the

[Bolton v. Hamilton.]

purchaser under such deed is a trespasser if he enters. In *Frederick* v. *Gray,* (10 *Serg. & Rawle* 218), and in *Brown* v. *M'Coy,* a note of which from the record I send herewith,* this court held twenty-two years' sole and exclusive possession by one tenant in common, gave title. The statute came in and was intended to put an end to presumption. Abandonment is vague; it may be found, after a very short period, supported by unequivocal acts and declarations. The statute is a certain rule, applicable to all cases; it is therefore fair; it leaves nothing to conjecture or prejudice; and the time is long enough.

---

* *Brown* v. *M'Coy.* In the Common Pleas of Mifflin county. There were two questions. Plaintiff alleged and had proved positively an agreement about 1791, that T. Brown, father of plaintiff, and uncle of defendant, showed the vacant land to old F. M'Coy, who moved on to it and made improvements, and lived on it till 1802–3, when he died. The plaintiff proved that T. Brown took out and paid for the warrant in the name of F. M'Coy, and superintended and paid for the survey; and that he was to have half of the tract. This suit was brought in 1825. After submitting to the jury the evidence of plaintiff's ownership of one-half, the court said, "If you believe he did own one-half, the second question presents itself. Where two men own a tract of land, and one of them takes possession in the name of and for the use of both, admitting the other's right, the possession is the possession of both, until he denies the right of that other, drives him off, or refuses him any share of the profits; or where there is no proof of actual driving off, or denying his title, or refusing him a share of the profits, until such length of time has elapsed as that a jury may and ought to presume a sale or release to the one in possession, or that he had denied the other's right and deprived him of all benefit from it. The precise, shortest time at which a jury ought to presume a conveyance by the one, or an ouster and dispossession by the other, does not seem to be settled; perhaps must depend in some degree on circumstances. This applies more properly where both tenants in common continue in life. In this case, about twenty-three years before this suit was brought, M'Coy died. If he was a tenant in common with Thomas Brown, so, ordinarily, would his family continuing in possession be. ·But if they never heard of any claim but that of their deceased father, and the title appeared to be all in him, if they entered, or continued as sole owners, and claiming the whole, though in truth they might not have had right to the whole, if they cleared, built, and leased, and received the rents, in the neighbourhood of Thomas Brown, for more than twenty-one years, the law bars the claim of Thomas Brown.

The Statute of Limitations was not made to protect valid and undisputed titles, but to quiet ancient continued possession under claim of right. It may be, nay, is necessary, if you think Brown ever had right to half, to inquire how the heirs of M'Coy entered on and possessed this land; if as only owning one-half and not denying Brown's right, the statute does not protect them without some evidence of their dispossessing Brown or denying his right. But if they entered as owners of the whole, believed themselves to be so, improved and expended money under this idea, and Brown permitted this to continue so for twenty-one years, the law bars his recovery, even if you believe Brown had once a good right to half the land. It will not do to let the statute run, and then evade it by saying, at the trial, and never before, that the man who owned it was actuated by pity, and this, too, said now by J. Brown who had purchased a right which had lain dormant for twenty-three years before he purchased, and who knew this when he purchased."

This opinion was reviewed by the Supreme Court upon a writ of error, and the judgment was affirmed about the year 1827.

[Bolton v. Hamilton.]

The general rule is that a man showing a title, that he entered and held according to it, though that title be defective, twenty-one years' possession under it makes it valid. If there be exceptions to the rule, they arise from facts; facts and inferences from facts are for the jury. Could any jury find from the facts and documents in this case, that either David or his sisters and brothers held, or any of them thought they held, as if there had been no proceeding in the Orphans' Court?

I should not have written this opinion, though differing from the majority of the court, if I had not been entirely convinced that the matters contended for by the plaintiff in this cause will unsettle the title of all estates valued and allotted to one of the heirs. If fifty-seven years will not admit and require all presumptions in favour of a title, no length of time will do so; and the longer the time the greater the probability that receipts, that loose papers in the office, that all which would show a good title, will have been lost.

Judgment reversed, and a *venire de novo* awarded.