## Rush *against* Barr.

Whenever the legal title to land is in one person, and the real interest in another, they form but one title, and the statute of limitation does not run between the holders of such title, until the trustee disclaims and acts adversely to the *cestui que trust;* and such disclaimer must be made known.

Fraud prevents the operation of the statute of limitation, and it does not commence to run until the discovery of the fraud.

ERROR to the common pleas of *Armstrong* county.

This was an action of ejectment by *William Rush* who survived *Victor Dupont,* assignee of *Archibald M'Call* against *Margaret Barr,* for a tract of land; and the question of law which was presented, arose out of the following evidence.

The plaintiff, to support the issue on his part, produced as a witness *Hugh Wason,* who being duly sworn testified as follows, to wit, "in the last of October or 1st of November in the year 1795, *William Wason* and myself came out and cut logs for a cabin; we hauled the timber early in the spring of 1796; there was a company of men came out past our improvement; Judge *Barr* and *Thomas Barr* were along, they built a cabin, and we discharged them, and told them *Billy Wason* claimed on his improvement. They were a stronger party than us, and they were not willing to quit. My brother *William Wason,* went to the settlement and brought out his family, and left me to keep the house: we were out several weeks before the *Barrs* came out, and when we discharged them the logs were cut and the foundations laid: there were logs enough to build a cabin; there was a shed built when we first went out, which was not in the lines of the tract in dispute; we were on the tract when the *Barrs* came out, and we discharged them from making their improvement. In the summer of 1796, *William Wason* cleared from three-fourths to one acre, planted it in potatoes; he staid until harvest and then went into the settlement to take up our harvest; he came out with Mr *M'Call* in August, and we articled with him. In the fall of the same year. *Thomas Herron* came out and purchased from *William Wason;* during this time the *Barrs* never came to do any thing on the land; we had, before *M'Call* came, run out our lines to suit ourselves, without reference to the old lines. I moved out of this county in 1797; the *Barrs* never until then done any thing, but located the cabin. The logs for the cabin were cut principally on the tract in dispute; we paid no attention to lines; the others we cut on the tract where *Herron* now lives. *Herron* moved his family on the tract; *William Wason* had left in the fall of 1796. My brother *William Wason* articled with *M'Call* for two tracts,

neither of them is this one.   I sold to *Milligan*.   This tract is one and *Herron's* the other."

The plaintiff then, further in support of the issue on his part, offered in evidence a warrant of acceptance to *Archibald M'Call* the assignee of the plaintiff, for thirteen tracts of land on the west side of the Alleghany and Ohio rivers, and Conewango creek, of which the tract in dispute is one.   Which testimony so offered, the defendant by his counsel did object to, and the court having sustained said objection rejected the testimony so offered ; to which the plaintiff excepted.

The plaintiff then gave the following evidence by *John Cowan.* " In the month of March 1796, *William Wason,* with his wife and family, was living in a cabin erected on the land in dispute, and in the same spring cleared about one acre of the land and put it in corn.   *Wason* remained on the land till the following harvest, and then brought out his father and mother, and put them into the cabin to keep the possession.   When winter set in, they all returned to the settlement.   The following year, perhaps, *William Wason* sold his right to *Thomas Herron,* who in the same year moved into *Wason's* cabin.   Shortly after that, *Herron* told me that he had sold the same land to his brother-in-law *Witherson,* in order to hold it.   *Herron* then moved off the land, and gave up the possession to a son of *Witherson's,* who continued to reside there on the land, in the same cabin, till the spring of 1798, when *Thomas Barr* and *Robert M'Dowell* went into an empty cabin, without a roof, which had been built on the same land and was known by the name of *Barr's* cabin.   The day following that on which they came, I was at their cabin, and either *Barr* or *M'Dowell,* in the presence of the other, told me that if they thought the father of *Witherson* would come on, they would proceed no further in making their improvements; but, after pausing a little, said they would go on with their improvement at any rate. They covered their cabin and moved into it.   Both *Barr* and *M'Dowell* told me they had bought the land from *Herron* and were to pay the same to *Herron* for it that he had paid to *Wason.*   *Herron* told me the same thing.   *Witherson* left the land when his uncle sold it."

The plaintiff then offered a bond from *William Wason* to *Archibald M'Call,* dated the 11th of August 1796, conditioned for the settlement of the land in dispute ; which, being objected to by the counsel for the defendant, the court overruled the objection, and admitted the evidence.

The plaintiff then further gave in evidence, an agreement between *William Wason* and *Thomas Herron,* dated the 11th day of August 1796.

An agreement between *Thomas Herron* of the one part, and *Robert M'Dowell* and *Thomas Barr,* of the other part, dated the 26th of May 1798.

The plaintiff then called as a witness *Benjamin Leisure,* who testi-

[Rush v. Barr.]

fied as follows, viz. "I was present at the execution of an agreement between *Thomas Barr* and *Robert M'Dowell*, at the end of which, they entered into the before mentioned agreement; by which, as I understood from all the parties, that *Barr* and *M'Dowell* were to keep *Herron* clear of *M'Call*, and that they were to continue the the settlement *Herron* had bound himself to maintain. I first knew of *Barr* and *M'Dowell's* improvements, in 1797. I came out in 1796; the cabin was fourteen or eighteen feet square. The promissory note, dated 26th May 1798, was given by *Thomas Barr* and *Robert M'Dowell* to *Thomas Herron*, at the time of making the agreement, as a payment of the purchase money of the land in dispute; and at the time the note was given, I signed my name thereto, as a witness; but I do not recollect whether the note was for part or in full of the purchase money."

The plaintiff then gave in evidence by *George Ross*, Esq. as follows: "I went to make a survey for *John Titus*, I think it was in 1803, 1804 or 1805. *Titus* wanted me to run in on the land in dispute, to fill his survey, as he was the oldest settler. I went to run in the same land, but was discharged by *Thomas Barr* and *Robert M'Dowell*, who told me they claimed the land under *Archibald M'Call* through *William Wason* and *Thomas Herron*. I then refused to go on the land in dispute."

It was then admitted that the title of *Archibald M'Call* was in the plaintiff.

The plaintiff then gave in evidence the testimony of *John Titus*, as follows: "I came to the country in March 1796, and saw a cabin erected on the land in dispute, in which *William Wason* was then living, with his family. In the same year, *Archibald M'Call*, and myself, went to the cabin; *M'Call* and *Wason* then entered into an article for the land; shortly after that, *Thomas Herron* called on me to witness that he had sold the land to a boy named *William Witherson*, who was present at the time, and that he had given up his right to the boy. Some time afterwards, perhaps a year, while Judge *Ross* and *M'Dowell* were surveying a tract of land belonging to me, *Robert M'Dowell* told me, in the presence of the judge, that he held the land under *William Wason's* claim and *Archibald M'Call*, and ordered them not to run into it. I asked *M'Dowell* if he held under his own settlement, and if he did, I would run into the land; he said that he did not hold the land under his own settlement, but under that of *William Wason*."

The defendant, on his part, to sustain his issue, gave in evidence as follows:

*John M'Dowell*, sworn, saith, "twelve of us came out in March 1796, and had built two or three cabins before we went to build *Thomas Barr's*. On Monday we went to build his. I saw *Wason's* improvement, it was burnt on Sunday, the day before *Barr's* cabin was raised. We saw on that day *William Wason*, *Hugh Wason* and

others; *Wason* told me we were improving on his tract; he said there was about two hundred acres in each tract.  We built the cabin, roofed it, and cut out a place for the door; we commenced deadening, I think it extended to half an acre; there was nothing done by *Thomas Barr* or *M'Dowell* in 1797; the day after we built *Barr's* cabin we built mine; we came back in two or three days; *William Wason* then had a cabin on the land.  In February 1798 they came out, and in May they had about eight acres cleared.  My brother lived on it till his death.  I don't recollect what was done with the eight acres, there was corn raised on it that summer, about four acres.  *Robert M'Dowell's* improvement, when he died, was 30 acres.  I think he died before the war.  *Thomas Barr* and his wife lived with *Robert M'Dowell,* who left his property to his brothers' and sisters' children, mine and *Thomas Barr's.*  I have worked some on the place, and am working some now.  I don't recollect when Mrs *Barr* died.  I don't know if I raised grain every year, I have four or five years.  I heard *Barr* say he would watch until they got out of possession, and he would take it.  *Witherson* cleared about four acres.  *Wason* had cleared three or four acres.  *Thomas Barr* cleared the side joining me; he claimed one half the tract.  I am on one of the tracts claimed by *M'Call.*  I know the lines around the tract, I carried the chain myself.  *Robert M'Dowell* died in the fall of 1800."

*James M'Dowell* testified that *Thomas Barr* lived on the land about three years after *Robert M'Dowell* died; he was not living on it when it was sold by the sheriff, he had left it two or three years before the sale; it is three years since *Margaret Barr* came on it; grain was raised all except one or two years; there was grain raised two or three years.  *Barr* left it about Christmas or new year's; I don't know if he put in a crop or not.

The defendant then gave in evidence a patent to *Robert M'Dowell* for 429 acres and 38 perches, on warrant dated in 1803; also, record of judgment of June term 1797, an ejectment at the suit of *Archibald M'Call* v. *Thomas Barr,* for 400 acres of land in Buffalo township; also transcript of a judgment, *William Wylie* v. *Thomas Barr, fi. fa.* June term 1819, on which the right of *Thomas Barr* to his interest in the tract of land in dispute, is levied on; *venditioni exponas* to September term 1819 returned—Sold to *James Monteeth* for 380 dollars.  A deed from *Philip Mechling,* Esq. sheriff, to *James Monteeth* for the right, title and interest of *Thomas Barr* in the land in dispute, dated 22d September 1819.

*John Cowan,* having been sworn, said, " I cannot recollect how long it was that no person resided on the land in dispute, there was one year it was not occupied.  We had it for pasture; the fields lay open and the neighbours' cattle run into it."

The court below thus charged the jury :

The plaintiff claims the tract of land in dispute by virtue of an alleged improvement and settlement thereon, commencing in the fall of 1795 by the entry thereon by *William Wason* for the purpose

P

of acquiring the title under the act of assembly of 1792. It appears a number of logs for a cabin were then cut down by him, and that he returned early in the spring of 1796, had a cabin put up, in which himself with his wife and children resided until harvest time, and in the intermediate time cleared and planted about three quarters of an acre of potatoes. It appears that he then moved into what was then called a settlement, as it may be inferred, to reap his fall grain there; and afterwards returned to the tract in dispute, where, it appears, he was on the 11th of August 1796, the date of a contract between him and *Archibald M'Call.* By this the settler recognized a right in *A. M'Call* to the land under a survey which had been made by the surveyor's deputy, and an acceptance thereof by the surveyor-general, and agreed to purchase 125 acres of the tract for the sum of one penny, and the further consideration of complying with the condition of settlement, improvement and residence required by the act of assembly, so that a patent can be obtained for the whole tract, the purchase of which had been paid by *A. M'Call.* It further appears that *William Wason* agreed to sell his interest in the tract and another adjoining it, the whole containing 250 acres, under his contract with *A. M'Call,* which *Thomas Herron* bound himself to fulfil, and upon which, within six months after, *Wason* was to make a sufficient title to him. Some time after this it would appear the parties went back to the settlement. *Herron,* it appears, returned to the tract the following spring and cleared about two or three acres, planted them with corn, and in the fall sowed them with wheat. How long he resided on the tract afterwards does not distinctly appear, but sometime after put the son of one *Witherson* in possession, who cleared three or four acres more and resided on the tract in the spring of 1798. Some of the witnesses believed seven or eight acres in all had been then cleared. This, considering the general situation of that quarter of the country, then, was a substantial improvement, entitled to respect and consideration.

On the part of the defendant a claim is set up to the land under an improvement, commencing in the spring of 1796, by the raising of a cabin by *Thomas Barr* and *Robert M'Dowell.* It does not appear they did any other work until the spring of 1798; they seem to be fully conusant of the improvement of *Wason, Herron* and *Witherson,* and of the contract with *Archibald M'Call.* They afterwards claimed according to the lines of the survey which had been improperly made for him. They would not permit them to be infringed on by any of the neighbouring settlers. It was, therefore, probably an object to acquire whatever *Archibald M'Call* had, and, which was certainly of much greater consequence, *the right of Herron,* under his own and *Wason's* improvement. This seems to have been brought about with considerable address. They take no assignment from *Herron* of his contract with *Wason,* which recognises that which had been entered into with *Archibald M'Call.* They execute a loose note, promising to maintain a settlement when

[Rush v. Barr.]

they had begun there, unless prevented by law.  They do not acknowledge any right in *Herron.*   What suit could be maintained by *Herron* on such a vague instrument, I am at a loss to conceive.   It is very possible that they then claimed adversely to *Herron* and *Wason's* improvement; and if they could persuade *Wason* to give up to them, they proposed claiming under what they called their improvement in the spring of 1796, by raising a cabin, the first that had been raised on the land in question.

They have taken possession of the whole, and carried on their improvements without interruption, or even notice by or on part of *Archibald M'Call,* from 1798 until June 1817, a period of nineteen years.   I feel much disposed, however, to get over this strong presumption of abandonment, but on further consideration I am of opinion it cannot be got over.   It is strengthened by the trial, brought in 1817, resulting in a verdict and judgment for *Thomas Barr.*   The present suit is delayed until March of the last year, which is another instance of great neglect.   Independent of these objections to the plaintiff's right of action, I am of opinion that the act of limitation applies to this case, and operates as a bar to the plaintiff's recovery.

Errors assigned.

1.  The court erred in rejecting the warrant of acceptance to *Archibald M'Call,* the assignee of the plaintiff for thirteen tracts of land, of which that in dispute is one.

2.  The court erred in charging the jury that there was a strong presumption of abandonment by the plaintiff.

3.  The court erred in charging the jury that there the act of limitations operated as a bar to the plaintiff's recovery.

*White,* for plaintiff in error, cited, 3 *Yeates* 289 ; 6 *Johns.* 34 ; 14 *Johns.* 224 ; 16 *Serg. & Rawle* 281; 10 *Serg. & Rawle* 194; 11 *Serg. & Rawle* 340.

*W. W. Fetterman,* for defendant in error, cited, 1 *Penns. Rep.* 74, 451.

The opinion of the Court was delivered by

Huston, J.—This case differs in its features from any heretofore brought from that portion of this state, which unfortunately has been so productive of lawsuits, and the settlement of which has been so retarded by contests as to settlers.

Among the evils which have arisen from those contests, one, and not the least, is the destruction or perversion of moral principle, which is too often disclosed.   Those who have a sense of the obligations of law and of religion, who would shudder at being told they were acting without regard to their duty to their neighbour, and in opposition to the commands of their God : men, who, in every part of their intercourse with society, endeavour to act with scrupulous honesty,

[Rush v. Barr.]

too often seem to think the ties which bind them in all other cases, have
no obligatory force in their transactions with respect to the titles to the
land on which they live.    Different opinions and different decisions by
our supréme court and the supreme court of the United States, for a
long time, made it doubtful what, under certain circumstances, was
or was not a good title ; every individual next formed his own opin-
ion, and with many men, all this resulted in a total disregard to any
and every contract made respecting the land.    I hope the time is
not far distant when the titles will be settled, and the plain rules of
law and of moral justice, will again be acknowledged in words and
in practice.

The same evil, and something worse, has occurred in other places,
and has disappeared ; has given way to reflection and a sense of duty
and right.

Before I come to the contracts of the parties, I will notice the sit-
uation of the plaintiff and his claim, and of the defendant, at the
time of the contract by the plaintiff and the defendant.    I mean
those under whom the plaintiff and defendant claim.

At the date of the act of 3d April 1792, all agreed as to its con-
struction ; and this is abundant evidence that those who took war-
rants were as strongly impressed with the necessity of making the
settlement, as those who claimed only by actual settlement.    The
continuance of Indian hostilities, and the impossibility of procuring
forty thousand actual settlers to go into a wilderness within two
years, set ingenuity at work to evade the law.    And among the
strange effects of this, was the arrangement by the officers of the
land office, by which they undertook to dispense with the provisions
of the law, and to grant patents on what were called prevention cer-
tificates ; but until the decision of the supreme court in *The Com-
monwealth* v. *Coxe*, many supposed these titles good.

Not to be behind the warrantees in attempts to evade the law, the
settlers, as soon as a few logs were cut, or a few trees deadened,
claimed to have as much right as if a house had been built, and a
family was residing in it.    And as many of these went to that coun-
try with the intention of making a *bona fide* settlement according to
the law, and were discouraged by the difficulty of procuring provisions
in a wilderness, where all wanted to buy food, and nobody had any
to sell, it soon happened that many wanted to sell their improve-
ments.    Another class, each of whom had commenced more than
one settlement, wished to sell all, or all but one.    Purchasers were
found ; for we have seen times when every body would buy land,·
and times when nobody would buy land, at least, not at a fair price.

The plaintiff seems to have purchased a dozen of these improve-
ments ; and as each is from a different person, we may take it, from
men who began *bona fide* to settle one tract, but had become discour-
aged.    Although the deputy surveyor ought not to have made a
survey for any one who had no warrant until he had made an actual
settlement, that is, until, at least, a person was residing thereon as a

[Rush v. Barr.]

home, yet surveys were made as soon as a few days' work had been done, and for men whose residence and family were many miles distant; and on these deadenings, not actual settlements and surveys, the officers of the land office received the purchase money, and warrants of acceptance issued, and perhaps, in some cases, patents. And on the principle of prevention patents to warrantees, this was right; an actual settler might be prevented from completing what he had begun, as well as a warrantee. The warrants of acceptance, which were one step towards a patent, could be no better than a patent; that is, they were in themselves, and unsupported by any thing else, of no avail, and no suit would be supported on them; but did not preclude the owner from showing that he had actually made the settlement according to law. The one in question, was obtained on the 7th of August 1795. The settlement of *J. Clark*, which it recites, had then begun, during the Indian hostilities; and *Clark*, or whoever came under him, would have had two years from *Wayne's* treaty, within which to make it his actual residence, and clear, and fence; and cultivate it, according to law; for in this country, as well as other parts of the state, he who had begun *bona fide*, was not required to stay the day and night, until his family was brought on; if he persevered in his improvement with due and reasonable diligence, he was protected. *M'Call* then came to this country in 1796, or before: he was on this land in 1796, claiming it on *Clark's* improvement, and he found *Wason* there, who also had commenced an improvement, but after *M'Call's* warrant of acceptance, and not within the lines of this tract. An agreement is made between *M'Call* and *Wason*, which recites, that *Clark* had made improvement on this tract, and a survey had been made by the deputy surveyor, and the purchase money paid by *M'Call*, and a warrant of acceptance to him; but that "no patent could issue, until the conditions of settlement, residence and improvement, directed and imposed on the lands, by act of 3d April 1792, shall have been completely performed and fulfilled;" and then goes on to state, "that *M'Call* had that day sold one hundred and twenty-five acres of the land, &c., being part of said survey to *William Wason*, who agrees and binds himself to perform and fulfil the settlement, residence and improvement required by the said act, so that a patent may issue for the whole tract. And then *Wason* binds and obligates himself to do all required by the act of assembly, in the very words of the act.

Now, let us pause and review this transaction. *M'Call* did not come to *Wason* and tell him, I have a good and complete title, and thus induce him to contract; he tells him exactly the truth, for I take it, that the recital, that *Clark* had commenced an improvement, is to be taken as strictly true between those parties at this time. What both parties state in argument to be the state of facts, is as much the statement of one as the other. Whether the work on the ground showed that somebody had been there before *Wason*, we

do not know, but *Wason* might know by inspection; and as he resisted the *Barrs,* would have resisted *M'Call.* But further, if no work had been done by *Clark,* the survey by the deputy surveyor, *Gapin,* for *Clark,* is, after thirty years, evidence of at least work done by *Clark.* All the rest of the statement of what *M'Call* had done, is proved by exhibits in the cause. The copy of the warrant of acceptance offered in evidence, was certified from the surveyor-general's office in May 1796, and was probably then exhibited.

From 1795 until 1796, there was no conclusive proof of abandonment by *Clark.* *M'Call* might then go on and complete the settlement, and had until the 22d of December 1797, in which to do it. It is distinctly understood and stated, that the title was inceptive, and would not be good unless followed up according to the directions of the act; and in consideration of one hundred and twenty-five acres, *Wason* agrees to do all the act requires, so that a patent may issue for the whole survey. It has been followed up, and the actual settlement made and continued five years, and a patent could have been got on that settlement, and on the money paid by *M'Call;* for although the warrant of acceptance is, I think, informal, yet as he had paid the purchase money for this tract, and had procured the actual settlement to be made within the time, a patent would have regularly issued for the use of *M'Call* and *Wason,* as their vendees, on that payment of money, though informally paid.

I repeat, that if *M'Call* had undertaken to sell a good title, or that he himself would procure a good title, when in fact he had no title, and could not procure one without an actual settlement, the law might on these facts have been, that the settlement made by *Wason* would have enured to his own use, and not for his own and *M'Call's;* but the bargain was very different, and was a lawful one, and ought to bind both parties.

If *M'Call* had not settled or procured some one to settle according to law, his warrant of acceptance and his money paid, would not have availed him; but he did, or procured another to do all the law required, within the time required, and the question, shall that other take all, or shall he be bound by his bargain, and take one hundred and twenty-five acres, leaving the residue for *M'Call.*

On the 17th of August 1796, only a few days after his agreement with *M'Call,* *Wason* conveyed to *Herron,* who bound himself to complete the settlement agreeably to *Wason's* contract with *M'Call.* There is something in this not explained on our paper book, it is a contract to sell two hundred and fifty acres, which he, *Wason,* had bought from *M'Call;* the case furnishes no evidence of his right to that quantity; but probably there was some written or parol agreement which we have not. *Herron* moved his family on next year, we find his nephew *Witherson* on, and three or four acres cleared and cultivated. In 1798, *Thomas Barr* and *Robert M'Dowell* came there—they had begun a cabin in 1796, and been absent two years. They bought from *Herron,* moved on and continued; and here we

[Rush v. Barr.]

meet with what induced the reflections with which I commenced. It is in full proof by parol, that they bought from *Herron,* and were to give him the same piece *Herron* gave *Wason,* and that they gave a note for the balance of the purchase money.   When another person wanted to take part of the land, they kept him off by *M'Call's* title, and *Wason* and *Herron's* improvement, which they said they had purchased; but the only written evidence of title was in these words, signed by *M'Dowell* and *Barr*: " be it remembered that we, *Robert M'Dowell* and *Thomas Barr,* do promise and covenant with *Thomas Herron,* to maintain a settlement according to law, where they began their settlement and now lives, unless prevented by law. Witness our hands and seals, 26th May 1798."

The last witness to this paper proved that he was present at the bargain, from begining to end—at the conclusion of which they entered into the above agreement.   That he understood from the declarations and conversation of all parties, that *Barr* and *M'Dowell* were to keep *Herron* clear of *M'Call,* and were to continue the settlement *Herron* had bound himself to maintain.

Now, from the words of the above agreement, it would seem, it was their own settlement, commenced in 1796, which they bound themselves to continue.

These persons, in 1803, took a warrant in the name of *Robert M'Dowell* and a patent.   *Robert M'Dowell* died in 1810, and left his half to *Barr's* children, and some other nephews of his.

The possession was continued regularly until *M'Dowell's* death, and *Barr* continued on for about three or four years after.   *Barr* became indebted, and in 1819, all the right of *Thomas Barr* to his interest in the tract of land, was levied on, and sold to *Monteeth.* *Barr* did not live on it then—he is since dead.   When the defendant, his widow, went on it, it does not appear.   This suit was brought to March term 1828.

It also was shown that an ejectment was brought in 1817, by *A. M'Call* against *Thomas Barr,* which resulted in judgment for the defendant.

The errors assigned are:

1. The court erred in rejecting the warrant of acceptance which was offered in evidence.   At first, I thought the court right in this particular, but a minute examination of the dates and of the several agreements, satisfies me that it ought to have been admitted.   It would not have been evidence as a ground of title between parties who never had privity with each other, not against an actual settler who, after the 22d of December 1797, entered on the land as vacant, and adverse to the warrant, unless along with it the defendant had shown some actual settlement connected with it; but it was evidence to shew that the statement of *M'Call* in his agreement with *Wason* was true, and if the defendant had acted fairly, it, or the payment of the purchase money on it, connected with the actual settlement of the defendant would have availed to procure a good title.

[Rush v. Barr.]

The judge was struck, as I have been, by the appearance of iniquity in the attempt of the defendants to get clear of their contract, only he calls it by the softer name of management. If the jury should find that the parol evidence is true as to *Barr* and *M'Dowell* purchasing from *Herron*, and that their agreement was put in its present form with an unfair design, the plaintiff would be entitled to recover an undivided part of the tract, containing in all above one hundred and twenty-five acres—I say, would be, unless the statute of limitations bars him. As to abandonment, I see no evidence of it; the land was in possession of the part owner under a written agreement. It does not appear that any proof of the settlement having been completed was offered to *M'Call*, or any call on him to take out a patent; by the agreement the possession was to remain with *Wason* or those claiming under him. The fact that *Barr* and *M'Dowell* claimed adversely was not of record in the county; in fact if Mr *Ross* believed they did not so claim in 1803 or 1804, the warrant in 1803 to *M'Dowell* was an act inconsistent with the agreement with *M'Call*, but if that warrant called for a settlement made by *M'Dowell*, the reading of it would give no notice that it was for a tract settled first by *Clark* and then *Wason*. The statute of limitations is a most useful one, and ought not lightly to be frittered away; but there are cases to which it does not apply. Whenever the legal title is in one, and the real interest in another, these form but one title, and the statute does not run between them until the trustee disclaims and acts adversely to the *cestui que trust:* so of landlord and tenant; the possession of the tenant is that of the landlord, who reposes safely on the effect of his lease until the tenant refuses to pay rent, disclaims the right of his landlord, and openly sets him at defiance. And so in all cases where two persons have each an interest in a tract of land, of such kind that both their interests form but one title, and by their agreement one is to possess for his own use and the use of the other. In such cases the statute does not run until he in possession disclaims the right and interest of the other— denies his right and refuses possession, and *such disclaimer and denial must be such that the other has notice of it.* It is not sufficient that it is denied secretly, or an agreement inconsistent with it is made and concealed. Fraud prevents the statute from running; it is well settled that the statute does not run until the discovery of the fraud. After the discovery of the facts imputed as fraud, it does run. *Kane* v. *Bloodgood,* 7 *Johns. Chan.* 90, 122, and cases there cited.

By the agreement between *M'Call* and *Wason,* the possession of *Wason* was to be the possession of *M'Call.* The latter could then repose in safety. The possession was to continue so till a certain time after, when a patent was to be obtained, and there was no exact agreement when it was to be divided. *Wason* conveyed to *Herron* in good faith, and the latter covenanted to fulfil the agreement with *M'Call.* Whether *Herron* joined in the plan to defraud *M'Call* of his interest, does not appear, but the defendant, if the witnesses be

[Rush v. Barr.]

believed, had full notice of *M'Call's* interest, and defended under it once when it suited them; at the same time, by agreeing to protect *Herron* against *M'Call*, it would seem a deliberate plan was formed, which was any thing but honest. If the jury, for it must be left to them, believe there was an intention unfairly to drop the contract with *M'Call*, and set up and hold under the merely colourable commencement made by the *Barrs* in 1796, and which had been abandoned two years, their conduct was fraudulent as to *M'Call*; they were, in honesty, in conscience and in law, as much bound to give him his share of the land as *Wason* or *Herron* was, and the statute of limitations does not begin to protect them until *M'Call* knew of this conduct and intention of theirs. The jury will ascertain when *M'Call* had knowledge of this unfair conduct, and if this suit was not commenced until twenty-one years after he had knowledge of these facts, then the statute of limitations bars the plaintiff; if twenty-one years had not expired from the time he had notice of such fraudulent and adverse act, it does not bar the plaintiff. The effect of fraud on the running of the statute of limitations did not occur to the court of common pleas in the hurry of the trial.

Judgment reversed, and a *venire facias de novo* awarded.