## The Susquehanna and Wyoming Valley Railroad and Coal Company *versus* Quick.

1. A paper pinned to a deposition, not referred to in it, and without evidence that it had been attached by the justice, was not an exhibit sufficiently identified to be admissible in evidence.

2. A release by a party to a witness of all claims, &c., against witness under a warranty in a deed, appearing on its face to have been regularly executed and acknowledged before the taking of a deposition, made the witness competent although not attached to his deposition so as to identify it.

3. Such release was a deed concerning lands, &c., and was entitled to be recorded.

4. A general warranty is a real covenant going with the title and passes to the assigns by its express terms.

5. A witness testified that a paper had been sent to an attorney years before, that search had been made for it and it could not be found, that an exhibit attached to his deposition was an exact copy. *Held*, that the copy was admissible in evidence.

6. A leading question is one which indicates the answer the party desires.

7. A mere reception of the profits and claim of land by one co-tenant will not alone prove an ouster. There must be positive acts or a line of conduct indicating an intention to exclude the co-tenants.

8. Open, notorious and uninterrupted possession of the whole by a tenant in common for twenty-one years, claiming the land as his own and taking the whole profits exclusively is evidence from which a jury may draw the conclusion of ouster and adverse possession.

9. In cases of express trust or where a direct confidence is created by the instrument, the evidence to show a denial of the relation must always be stronger than where the relation is less direct and confidential, as between co-tenants.

10. In all cases it must appear that the relation has been severed by such positive acts or continued conduct as tend to bring home notice of the change in the relation and that the holding is adverse.

March 12th and 13th 1869. Before THOMPSON, C. J., READ, AGNEW and WILLIAMS, JJ. SHARSWOOD, J., at Nisi Prius.

Error to the Court of Common Pleas of *Luzerne county:* No. 340, to January Term 1869.

This was an amicable action of ejectment, entered April 6th 1858, between Peter A. L. Quick, plaintiff, and The National Anthracite Coal Co., defendants. The land for which the suit was instituted consisted of two tracts of land, partly in the borough of Providence and partly of the borough of Scranton, one being lot No. 42, containing 383 acres, certified to Thomas

Wright; the other containing 206 acres, being the southern part of lot No. 43, certified to James Lewis. The Susquehanna and Wyoming Valley Railroad and Coal Company were, on the 11th of November 1867, substituted as defendants.

The case was tried before Elwell, P. J., of the 26th judicial district.

The plaintiff gave in evidence a patent, dated June 10th 1810, to Thomas Wright for 383 acres of land in Providence, being lot No. 42. Also the will of Wright, proved April 22d 1820, appointing Asher Miner his executor, with power to sell his real estate and deed of August 1st 1825 from Miner, executor to John B. Quick, for lot No. 42. Also survey of May 21st 1825, to Daniel David, for 208 acres 96 perches, part of lot No. 43 and survey of October 25th 1825, to James Lewis, for 206 acres, the other part of lot 43. No. 42, the northernmost lot, is referred to in this case as the "Miner lot;" the 208 acres are next south of it, and referred to as the "David lot;" the 206 acres are the southernmost part, and are referred to as the "Lewis lot"—the land in controversy being the Miner and the Lewis lots. The plaintiff gave in evidence also, patent, October 25th 1825, to J. B. Quick, Warmoldus Cooper and Abram Lefoy, for lot No. 43, one-fourth to Quick, and three-fourths to Cooper and Lefoy. Also deed with general warranty, February 3d 1844, from J. B. Quick to Peter A. L. Quick, for the grantor's interest in the Miner lot and in the Lewis lot, "being the undivided three-fourths" of the Miner lot and all the Lewis lot.

Slocum, a witness for plaintiff, testified that J. B. Quick entered on these lands in 1825 or 1826, and made coal openings on them; there was a house on the David lot and one on the Miner lot. The witness named a number of persons who resided on the land. Jacob R. Quick went there in 1841, and was there some years. J. B. Quick was coming and going for several years, superintending the taking out coal.

Whitbeck, another witness, testified that there was a house in 1828 on the Miner lot and one on the David lot; he also named a number of occupants up to about 1852 or 1853, when Jacob R. Quick came; in 1855 one Rummerfield came; he and Jacob Quick were put out in 1856 by the sheriff; the property was called the "Quick property."

Swartz and a number of other witnesses testified that J. B. Quick commenced to uncover coal about 1825, and continued taking coal out and superintending for some time.

Griffin testified to the same; and also that the property was occupied until 1856 by a number of persons successively, who were always understood to be tenants of Quick; Quick was put out in 1856; witness had heard of no other claim till then.

Lanning testified substantially as Griffin. There was evidence

also that after the tenants were put out by the sheriff the houses were burned.

The assessments in Providence in 1826 and 1827 were to John B. Quick; from 1828 to 1831 to George Biddis; from 1832 to 1842, except 1841, to F. A. L. Smith. In 1843 to Smith, J. B. Quick and J. R. Quick. In 1844 to T. Clark, Jno. B. and Jacob R. Quick. In 1845 to Clark, Jacob R. and Peter A. L. Quick. In 1846 to Peter and Jacob R. Quick and J. A. L. Smith. From 1847 to 1849 to. Clark and Jacob Quick. From 1851 to 1853 to Jacob. In 1856 to Peter, " 383 acres called the Miner lot." In In 1841, 1850, 1854 and 1855 there were no assessments.

Jacob R. Quick, a son of John B. Quick, gave testimony showing possession in his father, taking coal, renting, &c., by him or those claiming under him, from 1826 to 1856, when the occupants were put out by the sheriff.

The plaintiff offered the deposition of John B. Quick, taken September 4th 1858, before Samuel S. Thrall, Esq., together with a release dated August 10th 1858, from the plaintiff to the witness, duly acknowledged on the same day before Samuel S. Thrall, Esq., as follows:—

" Know all men by these presents, that I, Peter A. L. Quick, of Milford, in the county of Pike, and state of Pennsylvania, for and in consideration of the sum of one dollar, to me in hand paid, have and by these presents do remise, release, discharge and exonerate John B. Quick, of same place, from all liability for, on or account of any or all warranties, covenants or liabilities contained in a certain deed, dated February 3d 1844, from the said John B. Quick to Peter A. L. Quick, for land and premises lying and being in Luzerne county, which said deed is recorded in said Luzerne county, in Deed Book No. 50, page 428, &c., on the 3d day of July, A. D. 1844."

The release was not noted by the justice who took the deposition, was not endorsed, &c. An objection in writing to the competency of the witness was made before the justice at the taking of the deposition. The objection with all other papers connected with the deposition were fastened together in the usual way, but the release was merely pinned between the leaves. The defendants objected to the testimony on the ground of the incompetency of the witness, there being no evidence that the release had been executed before taking the deposition, and it was not identified as an exhibit accompanying it. The court admitted parts of the depositions and sealed a bill of exceptions for the defendants.

The witness testified that he had been in possession of the lands in 1825; he never gave up possession, leased the land in 1841 to his son Jacob R. Quick; he and those under him kept the taxes paid up until the plaintiff went into possession. John Q. Smith, his sister's son, had been in possession under him eight or nine

[Susquehanna, &c., Coal Co. *v.* Quick.]

years, in 1855. The plaintiff gave in evidence by Jeffrey Wells, under objection and exception, that F. A. L. Smith was agent of J. B. Quick for these lands, and then gave in evidence a lease dated March 31st 1834, from F. A. L. Smith to J. Q. Smith for lots Nos. 42 and 43, with other lands for one year at a rent of $100. Also lease dated April 1st 1835 from J. B. Quick to F. A. L. Smith for same lands for five years at $50 rent. Also lease dated April 19th 1841, J. B. Quick to J. R. Quick, for three years at the rent of $25. Also lease of plaintiff to Thomas Baker, dated March 21st 1846, for the Miner and Lewis lots with an acceptance by Baker of notice to quit at the end of two years from April 1st 1848. Also lease between same parties for same lands for one year from April 1st 1848, and leases dated March 22d 1832 and April 1st 1835, from plaintiff to Rummerfield for same lots, together for two years. Also lease, March 9th 1855 from plaintiff to D. T. Lewis for privilege of taking coal from the Lewis lot and for house on the Miner lot till April 1st 1857.

The plaintiff then gave in evidence a deed dated May 8th 1826, from J. B. Quick to George Biddis, for an undivided fourth of the Miner and David lots, the consideration being $6,000, and a deed of May 9th between the same parties for one undivided fourth of the Lewis lot. Also evidence for the purpose of showing that the deeds to Biddis were given as security for money which had since been paid.

The plaintiff having closed, the defendants gave in evidence the will of George Biddis, proved September 1st 1828, appointing Hugh Ross executor with power to sell his real estate: also deeds September 16th 1830, Hugh Ross, Executor to F. A. L. Smith: April 21st 1841, Smith to Thomas Clarke. Also records of ejectment, June 9th 1842, Thomas Clarke against Jacob R. Quick, for 800 acres. August 19th 1843, judgment for plaintiff for one-fourth of premises by agreement of J. R. Quick, filed in the suit: also deed September 29th 1825, John B. Quick to Cooper and Lefoy, for three-fourths of the Miner and David lots: also deed John B. Quick, Cooper and Lefoy, to Isaac Frost and Josephus Loring, for the Miner, David and Lewis lots, in trust for an association for the purpose of mining, &c., composed of J. B. Quick, Cooper, Lefoy and others named, and such others as may become associated with them, John B. Quick's interest being ten-fortieths, Cooper's three-fortieths, Lefoy's two-fortieths, and the remainder for the other associates, having each a number of fortieths set out in the deed, the business to be conducted in the manner determined by a board of directors of the association, and whenever the premises should cease to be occupied as contemplated by the association, and the association should be dissolved or discontinued, the trustees to convey the property to the associates according to their respective interests at that time. Amongst other recitals of

[Susquehanna, &c., Coal Co. *v.* Quick.]

title was a conveyance, dated June 17th 1825, to John B. Quick, from David, of his lot.

The defendants then offered a copy of the articles of association of the Company, (The Lackawanna Coal Company), mentioned in the deed of trust and other papers with the deposition of J. M. Cooper, who testified:

"That association did business in the city of New York. It was not incorporated. The original articles were sent I think several years ago to some attorney in Wilkesbarre, and have since been lost. Diligent search has been made for them and they cannot be found. (Witness shown exhibit attached marked " B.") This is a verbatim copy of the Articles of Association of The Lackawanna Coal Company, before mentioned.

(Witness shown book marked exhibit " D.") This book is the Stock Transfer Book of the said Company. (Witness shown exhibit attached marked " G.") The signature to this paper I think is the signature of John B. Quick. The stock mentioned in this certificate was sold to me. I became the purchaser of all the stock of the Lackawanna Coal Company. I received a deed from Isaac Frost, the remaining trustee. I think Mr. Loring was dead at that time. ' * * That association was continued until I purchased out all the shares. The organization was kept up according to the original articles until I sold out to Mr. Phelps. It was kept up until about June, 1849. I sold out to Mr. Phelps May 1853."

The plaintiff objected to the offer; it was rejected by the court except so far as the books may show transfers by the original cestuis que trust. The plaintiff offered twice the transfer of the shares of stock in the company, made January 11th 1826, by J. B. Quick to A. Quackenbush, in connection with the testimony of Cooper and of Quackenbush (the latter not furnished in the paper-book). The offer was rejected, and a bill of exceptions sealed. They gave in evidence deeds of August 7th 1840 and May 18th 1853, of Frost and Loring as trustees, and a number of the members of the association,—J. B. Quick not being one— to John M. Cooper, for the Miner, David and Lewis lots. Also record of an ejectment for 800 acres, being the Miner, David and Lewis lots, by Frost and Loring, trustees, against Jacob R. Quick, commenced April 7th 1846, in which, on the 4th of April 1848, Thomas Clark was substituted as co-defendant for one-fourth of the land. Judgment was entered October 5th 1854 for plaintiffs for all the land claimed in the writ, and at August Term a pluries habere was returned executed. This evidence was admitted after proof by A. T. McClintock, Esq., who appeared on the record for the defendant, that he had been employed by P. A. L. Quick, and represented his interest in the case. The defendant gave evidence by various conveyances that the title of Clark, and the legal title

[Susquehanna, &c., Coal Co. v. Quick.]

of the trustees were vested, January 25th 1856, in The National Anthracite Coal Company. On the 5th of April 1864 the whole title became vested in the defendants.

The plaintiffs gave evidence also by E. B. Harvey and others as to the existence and loss of the articles of association of the Lackawanna Coal Company.

In rebuttal, the plaintiff examined Jacob R. Quick, who testified that he was at the office of Mr. McClintock when the plaintiff was there. The plaintiff then asked : " Whether P. A. L. Quick asked Mr. McClintock if his rights would be in any manner affected by that suit, and that Mr. McClintock replied they could not, and that he could go home." The question was objected to by defendant as leading and as not being evidence. The evidence was received and a bill of exceptions sealed.

The witness testified: " Peter A. L. Quick asked Mr. McClintock if the ejectment suit brought against me would in any manner affect him. He said he could not be any party to the suit; he was not recognised in the writ. He said he had no interest, he had nothing to do with the case; he might as well go home; it did not affect his claim in any shape or form.

In order to present an intelligible view of this complicated case, the lucid charge of Judge Elwell is given in addition to the foregoing statement.

The defendants submitted the following points :—

2. To acquire a title under the statute of limitations by John B. Quick, against his own grantees, notice of his intention thus to acquire title must be shown to have been direct, clear, and positive, and the statute will run only from such notice.

4. The assessments given in evidence by plaintiff in this case, are not consistent with any claim of possession by John B. Quick, of any portion of the land in dispute, prior to the year 1843. On the other hand, they are entirely consistent with the legal title given in evidence by defendants.

6. When the evidence shows the occupancy of a house and garden only, the legal presumption is, that the occupant's claim of possession is restricted to the lines of that occupancy.

7. The dwelling by one man upon lot 42, and of another upon the Daniel David part of lot No. 43, is in law, under the undisputed evidence, a several occupancy, and the two cannot be tacked together as one possession, much less can such occupancy be claimed to extend over and embrace the James Lewis part of lot No. 43, upon which there was neither residence or cultivation.

8. The jury are not authorized under the evidence to join the three lots together, and the three Quicks together, for the purpose of finding a sufficient possession for plaintiff to entitle him to recover. Each lot must stand by itself and each Quick by himself.

[Susquehanna, &c., Coal Co. *v.* Quick.]

9. If John B. Quick on the 9th of May 1826 had any title to convey to George Biddis, and if such conveyance should by the jury be believed to have been for the security of money; in the absence of testimony that Thomas Clark had notice thereof, he was a bonâ fide purchaser of F. A. L. Smith, without notice, and neither he nor these defendants can be affected thereby.

Judge Elwell charged:—

"In October 1825 the title to the land in question was vested in John B. Quick, Warmoldus Cooper, and Abram Lefoy, Quick having one undivided fourth part, and Cooper and Lefoy three-fourths. There were three lots adjoining, certified to claimants under the compromise laws relating to the seventeen townships in Luzerne county. These lots are known here, one as the Miner lot, being No. 42, one as the Lewis lot, southerly half of No. 43, and these are the lands described in this ejectment, the former containing 383 acres and the latter 206 acres. The third lot is not embraced in this suit, but in order to understand the evidence, it is necessary to know that it is called the "Daniel David," or "Devee" lot, contains 208 acres, and is the north half of lot No. 43.

"On the 17th of October 1825 John B. Quick, Warmoldus Cooper and Abram Lefoy conveyed these three lots to Isaac Frost and Josephus P. Loring, in trust, for the purposes therein mentioned. The object being to mine coal, &c. The interest in the land or association being divided into forty shares: John B. Quick having ten shares or one-fourth, W. Cooper three shares, Abram Lefoy two, and so on, naming the persons who held shares and the number held by each. In case of the discontinuance or dissolution of the association, it was stipulated that the property should be conveyed to the cestuis que trust according to the shares held by them respectively.

["Whether the association ever organized or transacted any business we are not informed by the evidence.]

"On the 8th of May 1826 John B. Quick conveyed by deed the one undivided fourth part of lot No. 42, and also the Daniel David part of No. 43, to George Biddis, for the consideration of $6000. And on the next day, May 9th 1826, he conveyed the one-fourth part of the "Lewis" part of No. 43 to George Biddis for the consideration of $200.

"On the 3d of February 1844 he made a deed to his son, the plaintiff, of the undivided three-fourths, or all his interest in lot No. 42 (Miner lot), and in Lewis part of No. 43.

"The title of George Biddis under the deed of May 1826 became vested in Francis A. L. Smith, by deed of the executor of Biddis, dated 16th of September 1830, for the consideration of $735. On the 21st of April 1841 F. A. L. Smith, by deed, for

the consideration of $6500 conveyed to Thomas Clark. The title of Thomas Clark by sundry conveyances is vested in the defendant.

" The legal title, so far as held by the trustees, Frost and Loring, became vested in the National Anthracite Coal Company before the institution of this suit and is now held by the defendant.

" The plaintiff alleges that the deeds to George Biddis, although absolute on their face, were in fact merely security for money loaned, which has been repaid. He further claims that from 1825 down to the time of conveying to him, John B. Quick had been in the actual adverse possession of the property, and that he, the plaintiff, continued such adverse possession down to April 1856, when he was dispossessed.

" An absolute deed may be shown by parol evidence to have been given merely as security for the repayment of money, and therefore, only a mortgage. But when this is allowed the evidence ought to be clear and unequivocal. The terms of the contract ought to be shown with such clearness as to enable a chancellor to determine how much money was to be secured. In the absence of evidence showing that the consideration named in the deed is less than the value of the property at the time, nothing but the most convincing proof should be allowed to prevail against the solemn deed of the party, duly executed, acknowledged, and placed upon the records.

" But whatever may be the strength of the evidence, it will not affect a bonâ fide purchaser without notice.

" Had the purchasers of the title from Biddis any notice that these deeds were for a different purpose from what appears on their face? Smith had no connection with the title until the date of his deed in September, 1830. From 1832 to 1840 it is assessed to him as the owner. He was in possession by his tenants, so far as regards the Biddis title, the assessments to Smith and his possession were entirely consistent with the deed, and the possession thus held was not constructive notice of any equity existing in John B. Quick. I therefore hold, and so instruct you, that the title of John B. Quick, whatever it might have been, in the one-fourth part of the lands was divested, that it became vested in Thomas Clark on the 21st of April, 1841, by the deed from Smith, the grantee of Biddis, and the plaintiff claiming by deed of subsequent date, acquired no title to this one-fourth. As to that the verdict should be in favor of defendant.

" We come now to the other branch of the case. We have seen that in 1828 the legal title to the three lots became vested in trustees. But the plaintiff alleges that as against the conveyance by which it became so vested, his vendor continued in the possession; that he ousted the trustees and his co-cestuis que trust, and that his own possession continuing that of his vendor, makes in him a perfect title under the Statute of Limitations.

[Susquehanna, &c., Coal Co. *v.* Quick.]

[" It would seem that the company proposed to be formed by the deed of trust did not go into active operations upon the premises as contemplated.  Under these circumstances the shareholders would be entitled to a re-conveyance and may be regarded as tenants in common.]  But as against bonâ fide purchasers from the trustees, neither John B. Quick nor his grantee can hold the property unless by title acquired under the Statute of Limitations.

" In order to acquire title under the statute there must be an ouster of the owner, and actual, visible, notorious, and hostile possession continued and uninterrupted for a period of twenty-one years.  [If the jury shall find from the evidence that John B. Quick held from a period more than twenty-one years before April 1856, and down to the time of conveying to the plaintiff in 1844, and that the plaintiff from that time leased the property to tenants as his own, and was in the exclusive enjoyment of the rents and profits claiming the right, and that open, notorious, and uninterrupted possession was thus held by them, they may presume an ouster of the co-tenants and cestuis que trust of John B. Quick, and to the extent of such possession the plaintiff may recover.]

" Whether such acts have been done, and possession had, and to what extent, the jury will ascertain from the evidence.  In order to aid you I will call your attention to all the evidence upon the subject."  (The Court referred to the leases and the evidence upon the question of possession, and proceeded): " In order to acquire title under the statute as already stated, the possession must not be broken.  An entry by the owner or an action of ejectment successfully prosecuted would toll the statute.  In November, 1845, the trustees, Frost and Loring, brought ejectment for the three lots mentioned, against Jacob R. Quick, another son of John B. Quick, and a man by the name of Norton, in which Jacob R. Quick confessed judgment.  [If Jacob R. Quick, at the institution of the suit, was in possession of the lands in question, the judgment recovered against him, subsequently executed in 1856, by habere facias and putting out of the plaintiff, would have interrupted the statute, if it had not then run.  Or, if Peter A. L. Quick appeared to defend the suit the same effect would be produced.  It appears by the record that on the 1st of March, 1843, John B. Quick conveyed to Jacob R. Quick the David lot.  If Jacob R. Quick was in possession of that lot only at the time of instituting the ejectment and not of the others, then the suit did not interrupt the possession.

" You will determine from the evidence of Mr. McClintock and Jacob R. Quick and the papers in the suit, what was the character of the employment of Mr. McClintock.  If it was, as stated by Jacob R. Quick, to be merely to ascertain whether or not the result of the suit could affect his interest, and he was told it would

not, and he took no further part in the matter, the suit would not affect him.]

"We are requested by the counsel for defendant to instruct you upon certain written points which we will now read to you separately and answer.

"2. We affirm this point with this qualification. That after leasing the property for twenty-one years, as his own, accompanied with possession and exclusive perception of profits without being called to account, notice of his adverse claim may be presumed. This is not a presumption of law. It is raised only in case the jury believe it warranted by the evidence.

"4. Whether the assessments are consistent with the possession is for the jury. In 1826 John B. Quick & Co. are assessed with about the quantity of the three lots, and John B. Quick with twenty-five acres improved and three hundred and seventy-five acres unimproved and two houses. In 1827 John B. Quick & Co. are assessed with the quantity. From 1828 to 1830, inclusive, George Biddis & Co. are assessed. From 1831 to 1843, inclusive (except 1841), Francis A. L. Smith is the person assessed, some of the years apparently with all of land and some of them with three hundred and eighty-six acres, probably the Miner lot. From September 16th 1830, he held the Biddis title to one-fourth. From April 1st 1835, he appears to have acknowledged himself as tenant of John B. Quick, having that day taken a lease for five years. From that time it would seem that assessment to him was not inconsistent with a claim of title by his landlord, John B. Quick.

"6. The proposition contained in this point is correct. But if the occupant claims the whole lot and exercises over it such acts as owners generally do over their own property, his possession would not be limited to the spot occupied, but would be co-extensive with the boundaries of the lot.

"7. This point is not affirmed in all its parts. How the tenants held, of what they were tenants, how and what they occupied, are questions to be submitted to the jury. The property was occupied wholly by tenants to the extent that it was possessed and occupied. If the leases and occupancy of any tenant were of the specific lot, No. 42, and the David lot, or of either alone, and not of the Lewis part of lot No. 43, such possession could not be made available under the statute as to the latter lot. Neither could a separate lease of the David lot and occupancy under it, be considered in determining whether lot No. 42 had been held adversely for twenty-one years.

"8. We have instructed the jury in answer to the seventh point, as to separate tenants upon separate lots. We add that the possession to entitle a person to hold under the statute may be by himself or his tenants. The possession of successive tenants, if continuous, may be added together in making out the time.

11 P. F. SMITH—22

[Susquehanna, &c., Coal Co. *v.* Quick.]

" 9. As answered in general charge."

The verdict was for the plaintiff for three undivided fourth parts of lot No. 42—the Miner lot.

The defendants took a writ of error, and assigned for error :

1. The admission of John B. Quick's deposition.

2. The admission of J. Wells's testimony to prove the agency of F. A. L. Smith and the lease of Smith.

3. Rejecting the deposition of J. M. Cooper.

4 and 5. Rejecting the transfer of stock by J. B. Quick to A. Quackenbush.

6. Admitting the testimony of J. R. Quick as to the conversation of plaintiff with Mr. McClintock.

7–13. The portion of the charge included in brackets.

*A. Hand* and *W. H. Jessup* (with whom was *G. B. Nicholson*), for plaintiff in error, on the question of ouster by a co-tenant, as trustee, cited Adams on Ejectment 51 ; Keene *v.* Deardon, 8 East 248 ; Smith *v.* King, 16 Id. 283 ; Hill on Trustees 266, and cases there cited, and note ; Dighton *v.* Grewill, 2 Vent. 329 ; Gree *v.* Rolle, 1 Ld. Raym. 716 ; Pomfret *v.* Windsor, 2 Ves. Sr. 481 ; Rush *v.* Barr, 1 Watts 120 ; Coster *v.* Murray, 5 Johns. C. R. 504 ; Tulloch *v.* Worral, 13 Wright 133 ; Martin *v.* Jackson, 3 Casey 504 ; Hart *v.* Gregg, 10 Watts 189 ; Doe *v.* Bird, 11 East 49 ; Zeller *v.* Eckert, 4 Howard 289 ; Brandon *v.* Bannon, 10 Casey 263, s. c., 2 Wright 63.

*G. M. Harding* and *J. W. Maynard* (with whom was *J. Handley*), for defendant in error.—As to the 6th assignment, they cited Thompson *v.* Emmert, 15 Ill. 415 ; Aldrich c. Kinney, 4 Conn. 389 ; Thompson *v.* Blackhurst, 2 Nev. & M. 266 ; Starkie on Ev. 326, 327.  None but a party or privy can be bound by a verdict, &c. : Burrill *v.* West, 2 N. Hamp. R. 190 ; Wood *v.* Davis, 7 Cranch 271 ; Davis *v.* Wood, 1 Wheat. 6 ; Paynes *v.* Coals, 1 Munf. 473 ; Turpin *v.* Thomas, 2 Hen. & Munf. 139 ; Jackson *v.* Vedder, 3 Johns. 8 ; Case *v.* Reeves, 14 Id. 79 ; Ryer *v.* Atwater, 4 Day 431 ; Killingsworth *v.* Bradford, 2 Overton R. 204 ; Wood *v.* Stephen, 1 S. & R. 175 ; Estep *v.* Hutchman, 14 Id. 435 ; Taber *v.* Perrott, 2 Gall. 565 ; Twambly *v.* Henley, 4 Mass. 441 ; Respublica *v.* Davis, 3 Yeates 128 ; Johnson *v.* Brown, 1 Wash. 187 ; Stewellin *v.* Reed, 3 Wash. C. C. R. 274 ; Bell *v.* Harwood, 3 Term R. 308 ; Trinnelston *v.* Kernis, 9 Cl. & Fin. 781.  As to ouster by a co-tenant, they cited Frederick *v.* Gray, 10 S. & R. 182 ; Mehaffey *v.* Dobbs, 9 Watts 363 ; Law *v.* Patterson, 1 W. & S. 184 ; Bolton *v.* Hamilton, 2 Id. 294 ; Dikeman *v.* Parrish, 6 Barr 225 ; Culler *v.* Motzer, 13 S. & R. 356 ; Moore *v.* Collishaw, 10 Barr 224 ; Walker *v.* Walker, 16

S. & R. 379; Pepper v. Lodge, 4 Id. 310; Finney v. Cochran, 1 W. & S. 112.

The opinion of the court was delivered, May 11th 1869, by

AGNEW, J.—One objection to the release pinned to the deposition of John B. Quick was well founded. It was not identified as an exhibit accompanying the deposition. The deposition and all the other papers were fastened together in the usual way; but this paper was merely pinned between the leaves, leaving it without any evidence that it was attached by the justice who took the deposition. It is not referred to in the deposition or in any certificate, or by any endorsement upon it. No parol evidence was given to show that it was produced before the justice, or was returned with the deposition. In that it was in no wise identified. Under these circumstances, as a mere exhibit accompanying the deposition, it was not evidence, as is shown by the following cases: Petriken v. Collier, 7 W. & S. 392; Dailey v. Green, 3 Harris 127; Dixey v. Israel, 4 Wash. C. C. R. 323; 3 Barr 422. But this paper was a release of all warranties, covenants and liabilities contained in the deed from John B. Quick to Peter A. L. Quick. It fell within the words of the Act of 18th March 1775, as a deed concerning lands, tenements, hereditaments, and was therefore entitled to be proved or acknowledged and recorded. A general warranty is a real covenant descending with the title, and passes to the assigns by its express terms. It is often important to a purchaser to see that the title is defended by covenant of warranty. It is a part of the deed, and evidently concerns the land which is conveyed by it. Perhaps it might be important the release should be recorded to protect the warrantor against the suit of a subsequent purchaser without actual notice of the release. This release was duly executed and acknowledged nearly a month before the deposition was taken. It was evidence, therefore, under the recording acts, that John B. Quick had been released from all liability *quoad* the land in suit.

The second assignment of error cannot prevail, the objection to the offer was general and the evidence subsequently received took away the ground of objection, if any.

The third assignment has more substance. The defendant offered in evidence the deposition of John M. Cooper and a copy of the articles of association referred to in it, which was objected to on the ground that there was no evidence of the loss or destruction of the original articles. Cooper states expressly that the original articles were sent, he thinks several years ago, to some attorney in Wilkesbarre, and have since been lost; that diligent search has been made for them and they could not be found; that exhibit B. attached to the deposition is a *verbatim* copy of the articles of association. In the absence of any cross-examination

to explain, or other evidence to disprove the statement, it is difficult to see why the proof of loss and search was insufficient. The testimony of E. B. Harvey, given afterwards by defendant, certainly corroborates rather than contradicts Cooper's testimony. But resting on Cooper's testimony as the offer did, it seems to have been error to reject it. No objection was made to the proof of the existence of the original articles. The 4th and 5th errors follow that just considered. The 6th assignment must be sustained. The objection to the testimony of Jacob R. Quick as to the conversation between P. A. L. Quick and Mr. McClintock, was rested expressly on the ground that the question was leading in its form. It clearly was so, as it indicated just the answer the party desired. This is the rule as to what are leading questions. Selin *v.* Snyder, 7 S. & R. 166; Summers *v.* Wallace, 9 Watts 163. The form of the question was, "whether P. A. L. Quick asked McClintock if his rights would be in any manner affected by that suit, *and that McClintock replied that they would not, and that he might go home."* The purpose here was to get McClintock's reply to P. A. L. Quick's question, and instead of asking what he said in reply, the answer to be made by McClintock is immediately embodied in the question, indicating at once the answer expected. The objection was made and the ruling excepted to, and we cannot deny the party the benefit of it. The only other question that we need consider is that raised in the 9th, 11th, and 13th assignments of error, as to the evidence sufficient to prove an ouster between tenants in common. The pith of the judge's charge is that from an open, notorious and uninterrupted possession of John B. Quick and P. A. L. Quick, through their tenants, for twenty-one years, claiming the whole in their own right, leasing the property to tenants as their own, and taking the rents and profits exclusively, the jury might infer an ouster of their co-tenants. This is the law as it has been held in this state since Frederick *v.* Gray, 10 S. & R. 182; Mehaffy *v.* Dobbs, 9 Watts 377; Law *v.* Patterson, 1 W. & S. 184; Bolton *v.* Hamilton, 2 W. & S. 294; Calhoun *v.* Cook, 9 Barr 226; Keyser *v.* Evans, 6 Casey 507; Rider *v.* Maul, 10 Wright 376. A mere reception of the profits and claim of the land will not alone prove an ouster. There must be positive acts or a line of conduct indicating an intention to exclude the co-tenants. This has been said in Hart *v.* Gregg, 10 Watts 185; Forward *v.* Deetz, 8 Casey 68; Bennet *v.* Bullock, 11 Id. 364; Tulloch *v.* Worrall, 13 Wright 133.

In none has it been more strongly asserted than in Hart *v.* Gregg, but a *dictum* in that case somewhat wider than was called for, was afterwards criticised and qualified by Chief Justice Gibson, in Bolton *v.* Hamilton, 2 W. & S. 299, and Calhoun *v.* Cook, 9 Barr 227. What is said by Justice Thompson in Forward *v.* Deetz had reference to the facts of that case and was properly qualified by

[Susquehanna, &c., Coal Co. v. Quick.]

himself, in saying that it was not intended to assert there, that an ouster may not be presumed from great lapse of time and the circumstances. Every case must be judged of by its facts. It is therefore certainly the law that open, notorious and uninterrupted possession of the whole by a tenant in common for twenty-one years, claiming the whole land as his own, and taking the whole profits exclusively to himself, is evidence from which a *jury may* draw the conclusion of an ouster and an adverse possession. The distinction is that it does not afford a *legal* presumption, which would entitle the court to withdraw the question from the jury, and instruct them that they *must* infer an ouster, but it constitutes a natural presumption, or is competent evidence, from which the jury *may* infer an ouster and adverse possession, if not successfully rebutted. But the question of fact must be determined by the jury, for it may appear from all the circumstances that the possession is not adverse, notwithstanding the long continued reception of the profits. Every case depends on its own circumstances, as to the strength of the conviction it produces, and hence it must be left to the jury under a proper instruction, to determine whether the fiduciary character of the relation has been determined by a decisive act, or by a course of conduct bringing home notice to the party to be affected by it, of the change in the character of the possession. In the cases of *express* trust, or where there is a *direct confidence* created by the instrument, as between trustee and cestui que trust, landlord and tenant, mortgagor and mortgagee, &c., the evidence to show a denial of the relation, will always have to be stronger to produce conviction, than in those where the relation is less direct and and confidential, as between co-tenants. Rush *v.* Barr, 1 Watts 110; Martin *v.* Jackson, 3 Casey 504. McMasters *v.* Bell, 2 Penna. 180; Brandon *v.* Bannon, 2 Wright 63. Yet in all cases the rule is the same, to wit: that the relation must appear to have been severed by such positive acts, or continued conduct as tend to bring home notice to the party to be affected, of the change in the relation, and that the possession is adverse to him.

The remaining assignments of error need no special notice. They are not sustained. As a whole the change was fair and accurate, and the case was left to the jury in a very intelligible manner.

Judgment reversed and a *venire facias de novo awarded.*